555 F.2d 207
 COUNTY OF MARICOPA OF the STATE OF ARIZONA, a body politic,
Defendant-Appellant,
v.
Wilbur L. MABERRY and Dorothy E. Maberry, husband and wife,
surviving mother and father of Samuel Lee Maberry,
Deceased, Plaintiffs-Appellees.
 No. 74-2928.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 17, 1977.
As Amended on Denial of Rehearing and Rehearing En Banc May 2, 1977.
 
 Daniel Cracchiolo (argued) of Burch, Cracchiolo, Levie, Guyer & Weyl, Phoenix, Ariz., for defendant-appellant.
 Kenneth Rosengren (argued), Phoenix, Ariz., for plaintiffs-appellees.
 On Appeal from the United States District Court for the District of Arizona.
 Before BARNES, KILKENNY and WALLACE, Circuit Judges.
 BARNES, Senior Circuit Judge:
 
 
 1
 Appellant has two strings to its bow on this appeal. The first is the alleged error in instructing the jury on the last clear chance doctrine, and the second is the alleged misconduct of counsel for appellees.
 
 
 2
 Some discussion of the facts relating to each alleged error is necessary to understand the legal question urged. We attempt to summarize these facts in the margin, on the Last Clear Chance instruction issue,[1] and on the Misconduct of Counsel issue in the body of the second part of this opinion.
 
 I. Instructions
 
 3
 Appellant's first point divides the Last Clear Chance problem into five parts:
 
 
 4
 A. Its total inapplicability under Arizona law;
 
 
 5
 B. The law of Arizona advocating restraint in the use of the last clear chance doctrine, (hereinafter "doctrine"), was not followed;
 
 
 6
 C. If proper to be given to the jury, the instruction, as given was materially altered, and was confusing, and not a correct statement of the law;
 
 
 7
 D. County personnel never had actual knowledge decedent was endangered;
 
 
 8
 E. By restricting the doctrine's application to the County alone, and taking the question of its applicability away from other defendants, the County was improperly made a target defendant.
 
 
 9
 It is hornbook law that a federal court in a diversity case must follow the substantive law of the state where the incident occurred. (Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).
 
 
 10
 Appellant flatly asserts that "no case in the Arizona appellate courts has ever applied the last clear chance doctrine to a factual setting other than one involving mechanical instrumentalities under human control"; that each of the Arizona appellate decisions relying on the doctrine involved either railroad, motor vehicle, or airplane accidents. We assume this is a correct statement and that the 25 cases cited by appellants (in Note 2 attached to their opening brief on this appeal) are all, and the only, cases involving the doctrine in Arizona law. Appellees supply none.
 
 
 11
 On February 8, 1974, the Arizona Supreme Court approved the use of R.A.J.I. (Recommended Arizona Jury Instructions), to be used throughout the State of Arizona, and thereafter one apparently became "MAR(ICOPA) JI # 20 Instruction." MARJI Instruction # 20 applies to the last clear chance issue. The "four-fact" instruction relates to and is to be given if an "Inattentive Plaintiff" is involved. The "five-fact" instruction is to be given if a "Helpless Plaintiff" is involved. While, due to conflicting testimony, there may have been a question as to whether, and if so, when, the decedent was a "helpless plaintiff," there certainly was sufficient evidence to present the issue (as to whether or not he was helpless) to the jury. Therefore, if any approved last clear chance instruction were to be given, it was required to be the "five-fact" Last Clear Chance Instruction (MAR(ICOPA County) J.I. Negligence 20) which reads:
 
 
 12
 "The defense of contributory negligence does not apply if you determine that the following five facts exist:
 
 
 13
 (1) The plaintiff negligently placed himself in a position of danger; and
 
 
 14
 (2) The negligence ended or resulted in a situation of peril from which he could not escape through the exercise of reasonable care; and
 
 
 15
 (3) The defendant actually knew, or by exercise of reasonable care, should have known of plaintiff's situation; and
 
 
 16
 (4) The defendant realized, or should have realized that the plaintiff was in a helpless situation; and
 
 
 17
 (5) The defendant thereafter had a last clear chance to avoid the accident by exercise of reasonable care and failed to do so."[2]
 
 
 18
 It is clear that the "five facts" instruction differs in several substantial respects from the "four facts" instruction.[3]
 
 
 19
 So far as we can ascertain, no Arizona appellate court has ever applied the last clear chance doctrine to a situation where the alleged negligence of a defendant was in medical care. That is not surprising because normally a case such as this is filed alleging medical malpractice only, and not ordinary negligence as well. In Arizona, its State Constitution ordinarily requires that all questions of contributory negligence be left to the jury. It cannot be ruled out as a matter of law.[4]
 
 
 20
 Thus, the trial court was required to give the jury some instruction on contributory negligence. In the Arizona instruction as approved, and in the Restatement, there is no express limitation of any kind on the doctrine, and specifically none to "mechanical instrumentalities under human control." There is no question but that the doctrine became first established in law as a concomitant of the extensive use in America of railroads, streetcars, boats, automobiles, and airplanes. But this does not mean that the law in any one jurisdiction cannot extend the doctrine to factual situations not relating to mechanical instrumentalities. Appellees assert: "There appears upon exhaustive research to be no case in all America that restricts the doctrine of last clear chance to mechanical instrumentalities." (Appellees' Br., p. 16). That may be true, but if there be no such restriction, it seems strange that but one case in this country has been called to this Court's attention which has extended the doctrine to factual situations where mechanical instrumentalities are not involved.[5] Appellees likewise cite Davies v. Mann, 10 M. § W. 546, 152 Eng.Rep. 588 (1842) the original "Jackass case" in support of their position,[6] but refuse to recognize that a horse-drawn cart necessarily includes a "mechanical instrumentality." And appellant flatly urges that the only case extending the doctrine to a non-mechanical instrumentality case is one which was reversed on appeal, and is not actually a last clear chance case.[7]
 
 
 21
 We consider that one ancient British case; a 97 year old Iowa case; and one Texas case that doesn't discuss the doctrine, to be insufficient authority to convince us what the Arizona law is ; or if it is presently undeclared, that we can postulate on such slender reeds what it should be.
 
 
 22
 One nationally recognized authority states "the most often stated . . . explanation" for the doctrine is that "if the defendant has the last clear opportunity to avoid the harm, the plaintiff's negligence is not a 'proximate cause' of the result."
 
 
 23
 While this coincides rather well with the attempt made in the older day to fix liability upon the "last human wrongdoer," it is quite out of line with modern ideas of proximate cause. In such a case the negligence of the plaintiff undoubtedly has been a cause, and a substantial and important one, of his own damage, and it cannot be said that injury through the defendant's negligence was not fully within the risk which the plaintiff has created. If the injury should be to a third person, such as a passenger in the defendant's vehicle, the plaintiff's negligence would clearly be recognized as a responsible cause, and it is an utterly artificial distinction which applies any other rule when the plaintiff himself is injured.
 
 
 24
 (Reference notes omitted)
 
 
 25
 Prosser on Torts, 4th Ed., 1971, pp. 427-428 ch. 11, § 66.
 
 
 26
 Appellee states that Arizona applies the doctrine "as a means of determining the legal proximate cause of the injury in a negligence case" (Br., p. 22), citing Odekirk v. Austin, 90 Ariz. 97, 366 P.2d 80 (1971).
 
 
 27
 This is a correct citation, but gives little comfort to appellees when the Arizona Court tells of the reasoning behind the application of the rule of last clear chance.The reasoning behind the doctrine is that although the negligence of both plaintiff and defendant continues up to the time of the injury, plaintiff's negligence is remote while the defendant's conduct is the proximate cause of the accident. But "the biggest problem for both the trial and appellate courts necessarily arises in attempting to determine whether the negligent acts of both parties concur as proximate cause. If so, then clearly defendant cannot be guilty of having had the last clear opportunity to avoid the accident." Hirsh v. Manley, 81 Ariz. 94, 300 P.2d 588, 591 (1956).
 
 
 28
 The Arizona Court then suggests it will follow the American Law Institute's Restatement of the law, "except in cases where different rule has been laid down by this court." Judge Beinstein of the Arizona Supreme Court then refers to two situations to which the doctrine of last clear is applicable in Arizona. This discussion appears in the margin.[8]
 
 
 29
 Incidentally, we note that all discussions in Odekirk relate to a plaintiff injured by the operation of mechanical devices.
 
 
 30
 Appellant approves the cautionary language in Odekirk on the application of the last clear chance rule: "There are few, if any, legal doctrines that are more difficult of logical application . . . " (90 Ariz. 97 at 99; 366 P.2d at 81); while appellee finds comfort in the end of that same paragraph, namely: "(B)road statements . . . have (been) found . . . too broad . . . and must be explained and modified again. This process has not yet been completed." (366 P.2d at 81)
 
 
 31
 Difficult in application or not, we are not impressed with the strength of appellant's argument that because the trial court originally indicated it would not instruct on the doctrine to the jury (R.T. 390, lines 7-21), later had doubts about it (R.T. 435), but finally gave it in a modified form (R.T. D-210-211), that his final decision was necessarily erroneous. But one matter is here controlling: whether the precise instruction which finally went to the jury was correct or incorrect. Appellant urges the instruction given misstated the law. Appellee suggests it was correct. It is obvious that neither of the two previously approved state court instructions were given.
 
 
 32
 Without deciding (1) whether the doctrine is totally inapplicable under Arizona law where no mechanical devices are involved, or will or will not be under future Arizona law, or (2) whether the proper restraint was exercised by the trial judge in the application of the doctrine to the facts of this case, we turn to point I.C. urged by appellant: "was the altered instruction on the doctrine proper, or was it a misstatement of the law?"
 
 
 33
 We compare the last clear chance instruction given by the trial court, italicizing the departures from the approved MARJI Instruction No. 20 (five fact helpless plaintiff), as quoted above, and bracketing the omitted portions:
 
 
 34
 "Now, the defense of contributory negligence does not apply to the County of Maricopa if you find the following facts to exist:
 
 
 35
 1. That the plaintiff's decedent negligently placed himself in a position of danger.
 
 
 36
 (2. That the negligence ended or resulted in a situation of peril from which he could not escape through the exercise of reasonable care.)
 
 
 37
 2. That the defendant County of Maricopa actually knew (or by the exercise of reasonable care, should have known) of plaintiff's decedent's situation.
 
 
 38
 3. That the defendant County of Maricopa realized, or should have realized (that the plaintiff was in a helpless situation) that the plaintiff's decedent was unable to help himself or extricate himself from the situation he was in.
 
 
 39
 4. That the defendant County of Maricopa thereafter (has a last clear chance to avoid the accident by the exercise of reasonable care and failed to do so) had a last clear chance to avoid further harm to the plaintiff's decedent by the exercise of reasonable care and failed to do so." (R.T. 210-211; C.T. 448)[9]
 
 
 40
 Thus, the instruction given:(a) Took from the jury the contributory negligence, if any, of plaintiff, insofar as one of several defendants (the County of Maricopa, alone ), was concerned.
 
 
 41
 (b) Excised from the instruction the required finding by the jury that the (plaintiff's) negligence ended or resulted in a situation of peril from which plaintiff could not escape, i. e., the jury might have concluded the decedent's negligence had not terminated; i. e., that the effect of the plaintiff's voluntary ingestion of drugs had not ceased.
 
 
 42
 (c) Excised from the instruction the County's obligation to know that plaintiff was in a "helpless situation" (the language chosen carefully for the approved instruction).
 
 
 43
 (d) Changed the words: "has a last clear chance to avoid the accident, etc." to "had a last clear chance to avoid further harm to plaintiff's decedent." While we concede "accident" might not be the best word to use under the peculiar facts of this case, we cannot approve the instruction's inference that this one defendant, the County of Maricopa alone, had harmed plaintiffs' decedent, nor the inference that the jury was being instructed, as a matter of law, that plaintiff suffered at least two time periods of harm. These issues were for jury determination. This language is particularly susceptible to misinterpretation when we consider the excision of the "termination of plaintiff's decedent's negligence" language in (b) supra.[10]
 
 
 44
 As we understand the Arizona law, we cannot say, nor could the trial judge instruct, that the jury could not have found that the plaintiff's decedent was or was not himself negligent in his voluntary ingestion of a large quantity of drugs, constituting a continuing negligence which was a contributing factor to decedent's own demise. Again, such a decision is peculiarly a question of fact for the jury's determination.
 
 
 45
 Finally, we do not completely understand why or how Dr. Espinoza's actions and conduct, could, as a matter of law, not be subject to the last clear chance doctrine, when the jury was instructed that his employer, the County, was so subject. It may be because there were jailers and other County employees, unnamed as defendants, who might have had a last clear chance. The record does not disclose why this distinction was made in the instructions.
 
 
 46
 Appellant asserts that ordinarily the last clear chance doctrine is not applied to but one of several alleged joint tort feasors accused of negligence.[11] It enabled all defendants other than the County of Maricopa to rely on plaintiff's contributory negligence, which may or may not have been why all other defendants were exonerated.
 
 
 47
 Appellees assert that the Arizona Supreme Court has said: "The Constitution of Arizona, Article 18, § 5 . . . takes from the court all control of the defense of contributory negligence." (It is) "a question of fact, and shall at all times be left to the jury." Heinke v. Munoz, 106 Ariz. 26, 470 P.2d 107 (1920). "This includes . . . the right . . . to apply or not, as the jury sees fit, the law of contributory negligence as a defense." (Id. at 28, and 470 P.2d at 109, respectively). If this be true, most assuredly the jury must be properly, adequately and fully instructed on the subject.
 
 
 48
 Appellees' counsel argued to the jury the instruction on the last clear chance doctrine would "take care" of any contributory negligence of decedent.[12]
 
 
 49
 That doctrine apparently had never been applied by Arizona courts to any negligence cases which did not involve mechanical instrumentalities controlled by humans, nor to malpractice actions. Nor is there any convincing citation of cases from any other jurisdiction that has so extended the original doctrine. We need not here determine whether Arizona courts would or would not, or should or should not, so extend the doctrine, particularly in view of the caution warnings contained in cases and textbooks with respect to the application of Erie v. Tompkins, supra.[13]
 
 
 50
 "We are not required, however (under Erie ) to speculate as to how the State Court might decide the question before us if it has not already decided it." 1A Moore, Federal Practice, 3327.
 
 
 51
 But if we grant that a federal trial court may extend the last clear chance doctrine to cases where there is no mechanical instrumentality involved, it does not follow that it may instruct the jury contrary to what Arizona courts have approved as requisite in such an application, if it be made. And here appellees' counsel first : admittedly excised one material portion of the five-part instruction approved by Arizona for "helpless" plaintiffs in a situation claimed to require a last clear chance instruction, and second : modified the language in another paragraph of the approved instruction; and third : where the court, by its own excisions, made the County of Maricopa, defendant alone, an easy target, while eliminating the doctor (the County employee), who allegedly gave the wrong drug to the decedent; and the City of Phoenix, which had the first nineteen hours control over the arrested decedent.
 
 
 52
 Due objection was timely interposed to the instruction given. (R.T. Vol. IV, pp. 12-14). The court overruled the objection.
 
 
 53
 In so doing, the trial court interfered with the jury's sole right to adequately consider and pass upon the existence of contributory negligence on the part of the plaintiff, if any there might be, and in essence, directed a verdict for the two defendants (other than the County of Maricopa), to whom the last clear chance doctrine was said, as a matter of law, to be not applicable. Counsel for appellees so interpreted the court's action (Cf. note 12, supra ).
 
 
 54
 The Arizona law of whether an instruction contains reversible error is stated as follows:
 
 
 55
 If any instruction directly contradicts the true rule of law so that the jury would be misled thereby on a material point, it is, of course, fatal; if, however, it is merely incomplete in itself, but when taken together with proper qualifications made in some other portion of the instructions it correctly states the law, it is not reversible error, unless it is so ambiguously worded that a reasonable man, taking the instruction as a whole, would be misled thereby. Humphrey v. Atchison, T. & S.F. Ry. Co., 50 Ariz. 167, 70 P.2d 319, 323 (1937).
 
 
 56
 There was but the one instruction given on last clear chance. Under that test quoted, we conclude the instruction given on the doctrine of last clear chance would have misled the jury, was improper, and requires reversal.
 
 II. Misconduct of Counsel
 
 57
 The second point raised by appellant County of Maricopa as one requiring a reversal is the alleged prejudicial misconduct of counsel for plaintiffs.
 
 
 58
 During the trial, Dr. Tuchler, an expert medical witness, testified on behalf of Dr. Espinoza. His testimony was essentially that in his opinion decedent's death was the result of decedent's own voluntary massive ingestion, or overdose, of amphetamines. He also testified that giving the decedent a 100 milligram dose of Thorazine conformed to the medical standards of the community. Finally, he testified that phases of heroin withdrawal "mimic" amphetamine withdrawal. Plaintiffs produced expert evidence to the contrary.
 
 
 59
 At the conclusion of his cross-examination of defendant's expert witness, Mr. Rosengren, the lawyer for the plaintiffs, proceeded in the following manner:
 
 
 60
 Q. Doctor, at the time that your deposition was taken, I will ask you this, sir, isn't it a fact that at one point you interrupted and said: "Off the record. Come on, Ken
 
 
 61
 Mr. Cracchiolo (for defendant): Your Honor, I object.
 
 
 62
 Q. "Come on, Ken. You've got a damned good case and you know it." You said that, didn't you, Doctor?
 
 
 63
 A. I don't recall.
 
 
 64
 (R.T. C-100, lines 11-18).
 
 
 65
 The lawyer did not pause after the objection of his opposing counsel to permit a statement of grounds for his objection, or to permit the judge to rule, before the witness answered. There could be little doubt in any experienced trial lawyer's mind hearing this question, in the manner and sequence in which it was propounded, why it was asked.
 
 
 66
 A motion for mistrial was immediately made on behalf of defendant Espinoza, but the trial court contented itself with striking the comment from the record and admonishing the jury to disregard it.
 
 
 67
 Although the court did not grant the mistrial motion based upon this incident, in the hearing at the motion for a new trial where the same prejudicial misconduct was charged (and not upon the motion for a mistrial made during the trial), the judge said:
 
 
 68
 . . . Mr. Rosengren. You are a skilled lawyer, and I think it was very unbecoming to lower yourself to what I think was an improper bit of trickery, not only in the way it was accomplished but the fact that it was clearly inadmissible. It was not admitted for impeachment. There was nothing to impeach. It invaded the province of the jury, as you well know, called for an ultimate conclusion on which you could not have gotten an expert opinion. (R.T. D-237, lines 3-13).
 
 
 69
 Appellant argues that irreparable prejudice was caused because the statement before the jury encouraged speculation upon what was purposely being kept from them, and upon just how good the case was, as one of the defense witnesses had inferentially admitted. In Fike v. Grant, 39 Ariz. 549, 8 P.2d 242 (1932), where a plaintiff's lawyer deliberately asked about insurance, he was held to have improperly interjected prejudicial material and a mistrial was declared. The conduct in this case is similar. It was deliberate, and counsel for appellee still asserts he was entitled to ask the question.[14] It violated the Code of Professional Responsibility of the American Bar Association. It was error, and any impression it made upon the jury could not be wiped out by an ordinary instruction to disregard it.
 
 
 70
 Appellees' argument does not meet the claim of material prejudice asserted by appellant. Appellees first argue that the question was proper because the statement of opinion was in clear conflict with facts to which he testified. Atlantic Greyhound Corporation v. Eddins, 177 F.2d 954 (4th Cir. 1949). Dr. Tuchler's opinion, on a legal question (if he did state it)[15] was not in clear conflict, or necessarily inconsistent, with any of Dr. Tuchler's previous testimony.
 
 
 71
 Appellees then argue that to grant a new trial because of a lawyer's misconduct would be punitive in this case, and improper under Arizona law. The Arizona rule is that in reviewing misconduct of counsel the reviewing court's sole purpose is to judge whether misconduct of one's party attorney influenced the verdict of the jury in that party's favor. Zugsmith v. Mullins, 86 Ariz. 236, 344 P.2d 739 (1959). In that case, the court decided that the record itself made it apparent that the jury decided the case as it did because it was moved by the weight of the evidence and not because it was influenced by the remarks of counsel. However, in Zugsmith, the improper conduct was an ambivalent matter: mere rudeness to the court and other counsel. Such an act could have hurt the attorney's own client in the eyes of the jury. Here where counsel, in fact, testified to something not within the record, it is in our opinion impossible to fairly conclude from the record that the jury was not influenced by the question and answer. While it might be difficult to decide what precise effect it did have on the jury, we must consider whether the error was planned or accidental; whether intentional or otherwise; whether a risk deliberately taken by one side, or one created by forces, unexpected or otherwise, beyond the perpetrator's ability to control or eliminate. Under the circumstances herein disclosed, we must conclude appellees' improper conduct was clearly prejudicial to a fair trial, and constituted reversible error.
 
 
 72
 We come to this conclusion reluctantly, but firmly, because we conclude the non-medical question propounded to the expert medical witness was an intentional act, done with the sole purpose of bringing to the jury something it should not have heard. The question was grossly improper, highly devastating to the defense, carefully planned, and was an attempt to place an alleged opinion as to a legal matter by a non-legal expert (in an area of law not within his professional competency, expertise, or qualifications), before the jury.
 
 
 73
 At the time it was asked, the district judge described the incident as follows:
 
 THE COURT:
 
 74
 It was an entirely improper remark, has nothing to do with the relevancy of this case whatsoever. If you have any impeaching evidence, it should be on the record in there (i. e., in the record of the deposition) and not off the record, and you had your opportunity, if in fact it was true, to put it on the record. Having not done so, I am going to strike it from the record and direct the jury to disregard it and admonish you not to go into it any further. (C-101, lines 2-9). (matter in brackets inserted)
 
 
 75
 Thus the twice asked question was obviously quickly recognized by the trial judge as improper, irrelevant, incompetent, nonimpeaching, and clearly inadmissible.
 
 
 76
 At the time of the hearing on appellant's motion for a new trial, the judge, upon mature reflection, referred to appellees' counsel's conduct as "an improper bit of trickery," and emphasized "the way it was accomplished," and to the knowledge and experience of appellees' skilled and veteran counsel.[16]
 
 
 77
 To repeat:THE COURT: (at motion for new trial)
 
 
 78
 I would simply say you are no neophyte in this case, Mr. Rosengren. You are a skilled lawyer, and I think it was very unbecoming to lower yourself to what I think was an improper bit of trickery, not only in the way it was accomplished but the fact that it was clearly inadmissible.
 
 
 79
 (R.T. D-237, lines 2-7).
 
 
 80
 Because the expert medical witness (Dr. Tuchler) replied "I don't recall" (R.T. 100), Mr. Rosengren suggests first :
 
 
 81
 . . . there can be no prejudice against any party, since there was no evidence that came into the record by virtue of the unanswered question, . . .
 
 
 82
 and second :
 
 
 83
 because Dr. Espinoza was exonerated by the jury.
 
 
 84
 (Appellees' Brief, p. 29).
 
 
 85
 Mr. Rosengren then justifies his asking the improper question as "legitimate cross-examination of a clever courthouse medical-legal pro." It could not be "cross-examination" as to a fact or opinion and was not within the scope or content of the direct examination of the witness; and appeared nowhere else in the record, or in the deposition.
 
 
 86
 Counsel next relies, as authority for this statement, on Atlantic Greyhound Corporation v. Eddins, 177 F.2d 954 (1949), which is no authority for the position he has here taken:
 
 
 87
 In other words, the statement of the witness upon which he can be impeached must not only relate to the issues, but must be a matter of fact and not merely a former opinion of the witness in relation to the matter in issue, inconsistent with a different opinion which may seem warranted by his testimony or the facts to which he testified. Id. p. 957.
 
 
 88
 The Court in Eddins then summarizes with approval the views of Professor Wigmore (on p. 958):
 
 
 89
 If a witness testifies to facts, and when in possession of all the facts to which he has testified he has made a statement of opinion clearly in conflict or inconsistent with the facts to which he has testified, such a statement . . . will be admissible.
 
 
 90
 In Eddins, the Court points out the eye-witness to the accident (which was the basis of the litigation) was of one opinion on the morning of the accident, and, when he later observed other pavement marks, on the same day, was caused to change his mind, and his conclusion as to who was at fault, and his testimony. We have no problem with such a rule, but, again, that is not this case.
 
 
 91
 Appellant next cites Texas Indemnity Ins. Co. v. Alexander, 174 S.W.2d 109 (1943). That was a workman's compensation case where the expert medical witness testified claimant would make a complete recovery in six or twelve months, and was impeached by his previously expressed opinion that he could not determine the length of time it would take claimant to get well, and that paralysis could set in at any time. This cross-examination was allowed to impeach the witness, for the two opinions were entirely inconsistent, and each was within the expertise of a medical expert on a medical matter. This is a far cry from asking a medical expert what his opinion was on a legal subject.
 
 
 92
 Next Mr. Rosengren defends his position that the question was proper cross-examination by citing State v. Poole, 161 Or. 481, 90 P.2d 472 (1939), a statutory rape case, where the examining doctor after the alleged rape testified, as a factual matter within his knowledge, "There wasn't any medical evidence or symptoms that I could go by to show she had intercourse or hadn't had intercourse." (Id. p. 477).
 
 
 93
 To prove he had made a prior contradictory statement on cross-examination counsel was permitted to ask the doctor,Q. In your office, after the examination did you or did you not state to Mrs. X, the mother of Betty X, that from your examination you didn't think that the girl had lied to her?
 
 
 94
 A. I can't recall vividly that I made that statement.
 
 
 95
 Appellee then relies on A.L.R. and C.J.S. citations which relate only to impeachment on relevant and material matters.
 
 
 96
 Penultimately, on the misconduct charge, Mr. Rosengren asserts that appellant seeks to "penalize the Maberrys for the so-called misconduct of their counsel"; and that "in Arizona a new trial is never granted and used as a punitive measure," citing Zugsmith v. Mullins, 86 Ariz. 236, 344 P.2d 739 (1959) "but only to prevent a miscarriage of justice." Id. at 240, 344 P.2d at 740.
 
 
 97
 The same language is used in Anderson Aviation Sales Company, Inc. v. Perez, 19 Ariz.App. 422, 508 P.2d 87.
 
 
 98
 We entirely agree that is good law, in Arizona or elsewhere, and we propose to follow it.
 
 
 99
 Finally, the appellant County of Maricopa is charged by Mr. Rosengren with improperly attempting "to retry the case of Barzelis v. Kulikowski "; a case wherein Mr. Rosengren was mildly chastised by this Court in 1969 (9 Cir., 418 F.2d 869) (at which time it nevertheless also affirmed the judgment rendered by the district court jury in favor of Mr. Rosengren's client).
 
 
 100
 Judge Duniway, in discussing counsel's argument to the jury in Barzelis, had this to say:
 
 
 101
 Note 1.
 
 
 102
 The following is the peroration of counsel's closing argument:
 
 
 103
 Let me just conclude with some poetic words, it seems to me that to sum up the hopes and dreams and aspirations of what we want from a jury:
 
 
 104
 A jury reflects the attitudes and the mores of the community from which it is drawn;
 
 
 105
 It convenes only for the day and does justice according to its lights;
 
 
 106
 The group of 12 who are drawn to hear a case makes the decision and melts away.
 
 
 107
 It is one governmental agency that has no ambition.
 
 
 108
 It is as human as the people who make it up, so it sometimes is the victim of passion, but it also takes the sharp edges off the law and uses conscience to ameliorate a hardship.
 
 
 109
 Since it is of and from the community, it gives the law an acceptance which verdicts of judges could not do.
 
 
 110
 The jury has a profound educational impact upon the community.
 
 
 111
 You are here to right wrongs, and you have broad latitude to ameliorate a hardship.
 
 
 112
 All I really ask from you is that you have the courage of your convictions and not water them down so that we have a namby-pamby, indecisive situation where there is vacillation or hesitation or indecisiveness.
 
 
 113
 Be forthright and be fair, and bring us in a verdict, ladies and gentlemen, which when you go to sleep tonight will make you feel good.
 
 
 114
 And if perchance five years hence, fusion (sic) or not, you run into Marie on the street some place, you can face her and say to her, 'Marie, I thought then, and I think now that we did the right thing in your case.'
 
 
 115
 We have a low opinion of the planting of this kind of corn in a federal courtroom.
 
 
 116
 In his brief filed in this appeal, Mr. Rosengren states, at page 34:
 
 
 117
 In Barzellis (sic) the United States Court of Appeals criticized plaintiffs' counsel's language, and yet the precise language that they were critical of, turns out to be an extract from a book by Justice William O. Douglas, and his letter to counsel is set forth verbatim herein as Exhibit "A", so the Court can compare the language criticized with the precise language of Justice Douglas's book. (Emphasis added.)We have compared the language criticized with Exhibit A and fail to find that "the precise language" of which this Court was critical "turns out to be an extract from a book by Justice William O. Douglas."[17]
 
 
 118
 In his oral and written statements to this Court that "the precise language" used by him in Barzelis (and criticized by the previous panel as "the planting of corn in a federal courtroom") was the language of Justice Douglas, Mr. Rosengren, to say the least, was in error. After slightly re-editing Justice Douglas's words, Mr. Rosengren added his own first and the last five paragraphs, in his argument in Barzelis.
 
 
 119
 Mr. Rosengren was saved by the failure of his opponent to object to Mr. Rosengren's conduct in Barzelis in his argument to the jury (although his then opponent criticized it as "trickery and chicanery"). As our Barzelis opinion in 1969 stated: "The difficulty is that appellant's counsel did not object to this line of argument." (Id. at 870).
 
 
 120
 Coincidentally, appellees' last argument to us is that appellant County of Maricopa did not object to plaintiffs' counsel's argument. That would be correct, if counsel had inserted "immediately" ahead of "object." But counsel for Dr. Espinoza did immediately object. And counsel for the County and the City made their objections at the bench, as soon as the court permitted them to approach it. (R.T. C-101-104).
 
 
 121
 In summary, on the second issue before us, we hold the question asked of the witness Dr. Tuchler was prejudicial error requiring reversal because:
 
 
 122
 (1) The question asked was clearly irrelevant to any issue in the case;
 
 
 123
 (2) The question asked impeached nothing in the record, and could not be impeaching;
 
 
 124
 (3) The question was asked of an expert witness, and not a percipient witness, as to the subject matter not within his expertise or qualifications;
 
 
 125
 (4) The question was an attempt to impeach a witness by use of an alleged statement, alleged to have been made at the taking of the witness's depositions, which statement did not appear in and was never a part of that deposition; although, had it been made, Mr. Rosengren concededly had the means available to insert it in such deposition;
 
 
 126
 (5) There was no adequate proof introduced or proffered that the alleged statement had ever been made;
 
 
 127
 (6) The question was not inadvertently asked, nor did it slip out "in the heat of battle."[18] It was carefully considered, planned, and asked, in a way and manner to achieve the questioner's purpose.
 
 
 128
 In view of the conclusions hereinabove stated as to the merit of the two grounds urged for reversal, it is obvious we should and will, deny appellees' request to "determine the appeal is frivolous, and to award damages and costs for the added expenses and burdens on appeal." (Rule 38, Fed.R.App.Proc.)
 
 III. Conclusion
 
 129
 One more factor must be taken into consideration by this court. That is the fact that the experienced and able trial judge, after two months deliberation (May 10th to July 8th, 1974) denied the County of Maricopa's Motion for a New Trial.
 
 
 130
 Frequently we find that trial courts have refused to set aside a verdict and judgment in favor of a litigant, despite gross and egregious misconduct of a plaintiff's trial counsel, because a careful perusal of the record supplies "substantial evidence," which supports a jury verdict and subsequent judgment in favor of such lawyer's client.
 
 
 131
 Here, the trial judge stated: "The verdict showed that the jury carefully sifted out the three defendants and the evidence applicable to them, and the question of liability was resolved, I think on the basis of pretty overwhelming evidence in exactly the same manner that the court would have resolved it." (C.T. D-237)
 
 
 132
 The difficulty of this approach is that the trial court unquestionably believed and concluded he had instructed the jury properly on the doctrine of last clear chance, a conclusion with which we cannot agree. The fact that Dr. Espinoza was "let out," and his employer was not, is almost positive proof of the effect the criticized instruction (and Mr. Rosengren's reliance and emphasis upon it) had on the jury.
 
 
 133
 Ordinarily, we are most anxious to defer to the conclusion of the trial judge in determining whether he has abused his discretion. This is so because of his greater opportunity and advantage to observe all the parties and witnesses involved.
 
 
 134
 But such an advantage does not exist where there is a question whether the jury was properly instructed on the law. The trial judge and this Court stand on relatively similar levels in determining such an issue.
 
 
 135
 Mayo v. Ephrom, 84 Ariz. 169, 172, 325 P.2d 814, 816 (1958) is a leading case from that state, which sets a standard of review for action on mistrial motions limited to an alleged abuse of discretion.
 
 
 136
 It is a well settled rule of law that the granting of a new trial is largely within the discretion of the court, and that the appellate court will not disturb the ruling except for an abuse of discretion. The discretion in this sense is a legal discretion, based on reason and law. Where the showing for a new trial is insufficient both in form and substance, there is no discretion to be exercised. (Citing Arizona cases.)
 
 
 137
 In Sadler v. Arizona Flour Mills Co., 58 Ariz. 486, at page 490, 121 P.2d 412 at 413, we stated: "The granting of a new trial is different from an order refusing a new trial, for in the former the rights of the parties are never finally disposed of as in the latter they may be. The courts accordingly are more liberal in sustaining an order for a new trial than where it is denied."
 
 
 138
 The appellate court then carefully examined the record "to determine whether the trial court abused its discretion in entering the order for a new trial."[19] On a record of misconduct on the part of the plaintiff and his attorney (more frequent but less egregious than what we have outlined in this case), the Arizona Supreme Court said:It is well settled that . . . "If it appears manifest that the jury were actuated by prejudice or passion its verdict may not stand; * * * " Miller v. Condon, 66 Ariz. 34, 182 P.2d 105, 109. In Stallcup v. Rathbun, 76 Ariz. 63, 258 P.2d 821, 823, we reaffirmed the correct rule of law laid down in Southern Pacific Co. v. Tomlinson, 4 Ariz. 126, 33 P. 710, 711:
 
 
 139
 ' * * * of course, if it is apparent to the trial court that the verdict was the result of passion or prejudice . . . the verdict should be set aside. . . .'
 
 
 140
 We are of the opinion, and so hold, from an examination of the entire record of this case, that the trial court did not abuse its discretion in entering the order granting a new trial on all the issues of the complaint and answer, based on the cumulation of prejudicial remarks. We hold the prejudicial effect of the improper remarks went both to the question of damages as well as to the issue of liability for the alleged fraud. Southern Pacific Co. v. Gastelum, 36 Ariz. 106, 283 P. 719; Hallford v. Schumacher, Okl., 323 P.2d 989.
 
 
 141
 Every litigant is entitled to a fair, impartial trial, before a fair and impartial jury; a jury not impeded or influenced by improper instructions on the law applicable to the particular factual issue they must decide; and not being even possibly influenced by improper questions intentionally put to witnesses who appear before it. Somewhere the line must be drawn, as it has been done many times before.
 
 
 142
 Obviously, this should be done sparingly, and with great caution, particularly by an appellate court reviewing the matter, and more particularly, after an experienced district court judge has recognized one of the grounds on appeal the seriousness of the misconduct of the winner's attorney but has refused to grant the losing party a retrial of the basis of such misconduct, or on alleged improper instructions.
 
 
 143
 In Love v. Wolf, 226 Cal.App.2d 378, 38 Cal.Rptr. 183, at 184, the court, in reversing a judgment for plaintiff (in a malpractice suit), awarding a sum in excess of one third million dollars, the appellate court used language appropriate here:
 
 
 144
 Misconduct of plaintiff's trial counsel egregious beyond any in our experience or that related in any reported case brought to our attention has resulted in an unfair trial, a miscarriage of justice and requires us to reverse the judgment. Substantial evidence supported the verdict and judgment against the doctor (had the case been fairly presented). A new trial will be necessary against him. A closer question is raised . . . (as to the corporate defendant). . . . (A case against it for determination by a jury . . . (exists)).
 
 
 145
 The Judgment for plaintiffs filed on April 30th, 1974 is vacated and reversed as to the appealing defendant, County of Maricopa; and the matter remanded for a new trial.
 
 
 146
 Costs on this appeal are to be awarded to the prevailing party on retrial.
 
 
 147
 REVERSED AND REMANDED.
 
 WALLACE, Circuit Judge, dissenting:
 
 148
 I respectfully dissent.
 
 
 149
 The majority bases its reversal upon both the wording of the last clear chance jury instruction and the conduct of Maberry's counsel.
 
 
 150
 * It is true that the last clear chance instruction did not include the phrase that the negligence of plaintiff "ended or resulted in a situation of peril from which he could not escape through the exercise of reasonable care." Nevertheless, based upon the record before us, this was not error. The evidence would support a jury verdict that the Deputy Clark, and hence the County, was negligent in failing to comply with Dr. Espinoza's order to observe Maberry after administering the thorazine. By the time the thorazine was administered, Maberry was semi-comatose. The parties stipulated to this as a fact. Thus, during the time period of the County's alleged negligence, it is clear that Maberry was helpless. There is no evidence to the contrary. Because reasonable jurors could not fail to conclude that Maberry was helpless during the relevant time period, it was not error to fail to include an instruction calling for a determination of the factual issue of helplessness.
 
 
 151
 The majority also asserts that the failure to include this phrase took from the jury the issue whether Maberry's contributory negligence had "terminated." However, "ended" or "resulted in a situation of peril from which he could not escape through the exercise of reasonable care" are in the disjunctive. If either condition is satisfied, the requirements of the last clear chance doctrine are met. See Odekirk v. Austin, 90 Ariz. 97, 100-01, 366 P.2d 80, 82 (1961). Because it was clear that Maberry was helpless during the relevant time period, it was not necessary to determine whether his negligence had ended.
 
 
 152
 Also, although the instruction did not require that the County know of Maberry's "helpless situation," it did require that the County know or have cause to know "that the plaintiff's decedent was unable to help himself or extricate himself from the situation he was in." This terminology is essentially the equivalent of the excluded words. Whatever differences exist are not prejudicial.
 
 
 153
 Further, the changing of "accident" to "further harm" is a proper modification of the last clear chance instruction considering the peculiar facts of this case. The majority seems to believe that because there was evidence that Maberry's own ingestion of drugs was a substantial factor in his death, the jury should not have been given instructions which focused on the County's responsibilities. However, notwithstanding Maberry's possible role in his death, the County did have certain responsibilities, including the duty upon going to Maberry's assistance to use reasonable care in providing aid. See Barnum v. Rural Fire Protection Co., 24 Ariz.App. 233, 537 P.2d 618, 621-22 (1975). However, liability for breach of this duty arises only where the breach increases the risk of injury or aggravates the injury. See Restatement (Second) of Torts §§ 323, 324 (1965). This is only proper, for if the injury would have occurred notwithstanding the County's faulty assistance, that assistance cannot be deemed the proximate cause of the injury. Thus, it was appropriate for the instructions to emphasize the factual question whether the County's actions increased the risk of Maberry's death or created a risk of death where there had been none previously. I believe that the use of the words "further harm," while perhaps not the best choice, adequately accomplished this task. These words make it clear that unless there was some consequence flowing from the County's action, beyond that resulting from Maberry's ingestion of the amphetamines, the County could not be liable. Thus, there was no error.
 
 
 154
 Finally, the majority objects because a last clear chance instruction was given only as to the County and not as to Dr. Espinoza or the City of Phoenix. I do not see how the County has standing to raise the district court's failure to give a last clear chance instruction as to the other defendants. The only people who should be able to assert error are the plaintiffs and they do not. While the absence of a last clear chance instruction as to Dr. Espinoza or the City may have made the case more difficult for the County to defend, that tactical disadvantage is not legal error.
 
 
 155
 In conclusion, I can see no error in the instructions. Moreover, the evidence is consistent with the verdicts returned by the jury. From the verdict in favor of the doctor but against the County, we can assume that the negligence that the jury found pertained to the failure of the jail personnel to make proper observations of Maberry as Dr. Espinoza had instructed. There is evidence in the record to support this result: Dr. Espinoza himself gave instructions that Maberry be observed after the thorazine was administered. Thus there is no basis for overturning the jury verdict.II
 
 
 156
 I agree with the statements of the majority condemning the behavior of Mr. Rosengren. I do not agree, however, that in this case that behavior constitutes sufficient cause for us to order a new trial.
 
 
 157
 After the jury returned its verdict, the County moved for a new trial on the basis of Rosengren's misconduct. After two months of deliberation, the district judge denied the motion. In making this determination, he stated:
 
 
 158
 The verdict showed that the jury carefully sifted out the three defendants and the evidence applicable to them, and the question of liability was resolved, I think on the basis of pretty overwhelming evidence in exactly the same manner that the court would have resolved it.
 
 
 159
 The decision whether to grant a new trial is a question of federal law, even where federal jurisdiction is based upon diversity of citizenship. Holmes v. Wack, 464 F.2d 86, 88 (10th Cir. 1972); 6A Moore's Federal Practice P 59.04(1). Under the federal rule, the district court is free to exercise its discretion on whether to grant a new trial. We overturn that decision only when it amounts to an abuse of discretion. Ruiz v. Hamburg-American Line, 478 F.2d 29, 31 (9th Cir. 1973). The rule is particularly appropriate in a case such as this where the district judge has had a firsthand opportunity to assess the prejudicial effect of the attorney misconduct. I do not see any basis for holding that the district judge abused his discretion in denying the motion for a new trial. Accordingly, I do not believe that we are free to order a new trial on the basis of Rosengren's misconduct.
 
 III
 
 160
 Because of the conclusion I reach on the jury instruction and attorney misconduct issues, it is appropriate to confront an additional issue that the majority examines only indirectly: Given the facts of this case (i. e., no mechanical device), was the district court correct in raising for the jury's consideration the doctrine of last clear chance? Does that doctrine even apply to a fact pattern such as is presented here?
 
 
 161
 The district court determined that the Arizona Supreme Court would have applied the doctrine of last clear chance on the facts of this case. In diversity cases where state law applies, it is the settled rule in this circuit that we will not overrule the district court's interpretation of state law unless it is clearly wrong, particularly if the highest state court has not passed on the matter. Smith v. Sturm, Ruger & Co., 524 F.2d 776, 778 (9th Cir. 1975); Robinson v. United States, 518 F.2d 1105, 1108 (9th Cir. 1975); Hurst v. Dare To Be Great, Inc., 474 F.2d 483, 484 (9th Cir. 1973); Turnbull v. Bonkowski, 419 F.2d 104, 106 (9th Cir. 1969). In my view, the relevant Arizona cases provide no basis for holding that the district judge was clearly wrong. It is not enough to suggest that were we the district judge, we would exercise caution in extending Arizona doctrines where the Arizona courts have not previously spoken. We should, therefore, uphold the district judge's decision on the application of the last clear chance doctrine.
 
 
 162
 I would affirm.
 
 
 
 [1]
 (We adopt a portion of appellant's resume of the facts as a shorter, fairer, and less argumentative statement thereof. (As an example, we refer to the first paragraph of Appellees' Brief on Appeal, p. 2 thereof.) References to the Reporter's Transcript are to the four volumes thereof, numbered A, B, C, and D, respectively.)
 This is an appeal by defendant County of Maricopa (hereinafter County) from the decision of the jury and judgment of the District Court that defendant County is liable for the death of plaintiff's decedent Samuel Maberry. The verdict against the County was for the sum of $60,000.00. Plaintiffs, the parents of Samuel Maberry, also named the county's employee, Dr. Francisco Espinoza, and the City of Phoenix (hereinafter City) as defendants. The jury found in favor of Dr. Espinoza and the City. The verdict and judgment were rendered on April 26, 1974 and a timely motion for a new trial was denied on July 8, 1974. This appeal was filed on July 30, 1974. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.
 Plaintiff's decedent Samuel Maberry (hereinafter Maberry) for a period of time prior to his death was a drug user (A. 113-114). It is not completely clear if he was an habitual user (B. 67). On various occasions Maberry had committed felonies under the influence of drugs (A. 14-15). Maberry had used amphetamines (D. 63), Sacobarbital (B. 66), reds (B. 67) and marijuana (B. 74). There is evidence that prior to Maberry's death he had ingested enough amphetamines to have either caused his death or somehow in combination with the County administered medication (thorazine) contributed to his death (A. 119).
 Maberry, a resident of California, travelled to Arizona sometime in early August 1972 for unknown reasons (A. 116). Soon after 12:00 midnight on August 7, 1972 Maberry was arrested and charged with possession of dangerous drugs (a felony) and public intoxication (a misdemeanor) (C. 153, C. 150, A. 116).
 Officer Spitler of the Phoenix Police Department made the arrest. He had been called to the scene by citizen complainants who had reported Maberry to have been vomiting and acting strangely (C. 147, A. 116). Officer Spitler after placing Maberry under arrest searched his person and found baggies of Mexican bennies (C. 151, 152) that were later identified as dangerous drugs (C. 155). Maberry was handcuffed and transported in the back of a patrol car to the Phoenix Police Station (C. 153, C. 156).
 There was some indication that Maberry may have vomited in the police vehicle and again soon after his arrival at the station, but no witness actually saw this (C. 157). Maberry cooperated during the investigation procedures (C. 158). He was able to carry on a conversation but his speech was hard to understand (C. 158). During this time he was observed to be extremely restless (C. 158). Officer Spitler considered hospitalizing him but did not because his condition had greatly improved from the time when the officer had first observed him (C. 158, 159).
 City police guard Martin Miles observed that Maberry did not make roll call that morning (A. 190). City Officer Martin found Maberry to be asleep and woke him (A. 191). Martin thought that Maberry was high (A. 194). While Maberry was with Martin he asked whether: "This was the California Land Company?" (A. 195). Maberry was taken before a City Court judge to be arraigned on the misdemeanor charge of public intoxication (A. 196). Maberry at his arraignment inquired, "if this was the California Land Company" (A. 198). The court read the charge and asked for Maberry's plea. Maberry stated that he understood the court and said: "I am guilty." (A. 198, 199).
 After Maberry's return from the arraignment he was observed by City jail personnel to be normal (A. 391). Plaintiff's witness, Harold Lenzy, gave testimony that conflicts with the testimony of the police officers. Lenzy testified that he realized that Maberry was sick and that he complained about it to the city guards. (A. 125). Around 7:00 p. m. Lenzy and Maberry were transferred across the street to the County Jail along with other prisoners because of the outstanding felony charges. In point of time Maberry had been in the exclusive custody of the City for approximately 19 hours.
 At the time of transfer to the County Jail Maberry was able to walk unassisted and was aware of his surroundings (A. 337). Upon arrival at the County Jail he was placed in a waiting area or holding tank (C. 253). He subsequently went through some of the booking procedures (C. 253). He then had a shower. All but one witness (Lenzy) testified that Maberry needed no assistance (C. 255). Fingerprinting followed this but Maberry refused to cooperate and he was belligerent (C. 256). Because of his belligerence Maberry was then placed in another holding tank which he walked to without assistance (C. 257). County deputies had been advised by the City Jail that Maberry had some drug problem and so a sick slip was prepared for him by one of the County deputies (A. 340).
 Sometime late the following morning or early afternoon Maberry was moved to a third holding area in the County Jail (A. 366). A short time later he was seen on the floor of the holding area and a deputy sheriff assigned to the jail reported this fact to a jail supervisor (B. 37). As a result of this report, Deputy Russel Clark went to the holding area (C. 312) and he observed Maberry, now seated on a bench (C. 313). Maberry in the presence of Clark moved from the seated position and went down on one knee (C. 313, 314). He then went onto his side and then his back (C. 315). At this time Maberry's hands were over his stomach, his eyes were open and he was mumbling (C. 315, 316). Clark observed normal breathing and felt a strong pulse (C. 316). After having observed this bizarre behavior, Deputy Clark telephoned Dr. Espinoza (C. 317) because Clark thought Maberry was going to go through the painful process of heroin withdrawal (C. 319). From about 8:00 to 10:00 a. m. that day Espinoza had been to the County Jail for the purpose of seeing prisoners with medical problems. Espinoza was a physician employed by the County as chief of the detention ward at the County Hospital whose duties included conducting a morning sick call at the County Jail. Prisoners who saw Dr. Espinoza did so after filling out a sick slip or having someone else do it for them (C. 294, 295).
 Deputy Clark was a county jail paramedic who had trained with Dr. Espinoza (A. 236). Clark explained to Espinoza over the telephone that Maberry was about to go into heroin withdrawal (C. 319, 320). Espinoza after hearing Clark's description of Maberry's symptoms told Clark to give Maberry 100 milligrams of Thorazine (a small dose) and observe the prisoner (C. 320, 321). Prescribing medication by telephone was a procedure followed in special cases (C. 321). If a prisoner needed medication after the time that Espinoza had left the jail and prior to his return visit the following morning, medication might be ordered by telephone (C. 321). Pursuant to Espinoza's direction Clark gave Maberry a 100 milligram pill of Thorazine (C. 321).
 Within an hour after having taken the Thorazine, Maberry was found to be having problems breathing. He was immediately given artificial respiration, oxygen and heart massage (C. 285, 286). An ambulance arrived soon thereafter and Maberry was taken to the County Hospital (C. 211). There resuscitation and other treatment was carried out. Maberry was pronounced dead at 2:55 p. m., August 8th (C. 428).
 (Inasmuch as the first issue raised on this appeal is the validity of the Last Clear Chance Instruction given by the trial court, and the second relates only to alleged misconduct of appellee's counsel, we deem the foregoing a sufficient factual statement to advise readers of the general nature of the action.)
 
 
 [2]
 See also 2 Restatement of Torts, § 479(b)(i) and (ii); Harper & James: The Law of Torts, Vol. 2, § 22:13, pp. 1245, et seq
 
 
 [3]
 (A) Fact (2) supra, is not included in the "four-fact" instruction
 (B) Fact (3) in the four-fact refers to the failure of defendant to "realize" that plaintiff was "inattentive." Fact (3) in the five-fact refers to the failure of defendant to have "known" of "plaintiff's situation."
 (C) Fact (4) of the "five-fact" instruction is not contained in the "four-fact" instruction.
 
 
 [4]
 Arizona Constitution, Art. 18, Sec. 5, "The defense of contributory negligence or assumption of risk should, in all cases whatsoever, be a question of fact and it shall, at all times be left to the jury." Cf. Heimke v. Munoz, 106 Ariz. 26, 470 P.2d 107, 108-111 (1970)
 
 
 [5]
 That case is Weymire v. Wolfe, 52 Iowa 533, 3 N.W. 541 (1879). This ancient case is not apposite in its facts to the facts of this case. In it, Wolfe, a bartender, had sold Dunn, the deceased, intoxicating liquor, which caused Dunn to be intoxicated, and as the opinion states, "while Dunn was in a helpless and unconscious intoxication, caused by the wrongs of the defendant, he the defendant wrongfully expelled Dunn from his saloon at a late hour of the night, and that Dunn, being thus intoxicated, died of cold and exposure." (Emphasis added). The trial court instructed a verdict for defendant, and this was held error, and the judgment for defendant was reversed
 We have no record of what happened on the second trial, if there was one. But surely, here the defendant had nothing to do with creating any condition of the decedent with respect to the original ingestion of the narcotic drugs.
 
 
 [6]
 See Prosser, Torts, 4th Ed. "Last Clear Chance" § 66, p. 427. There he states: "No very satisfactory reason for the rule has ever been suggested."
 
 
 [7]
 East Texas Theaters v. Swink, 142 Tex. 268, 177 S.W.2d 195 (1944). Here plaintiff Swink fell into an orchestra pit from the stage of a darkened un-opened theatre. This case is one of alleged "discovered peril," which we will assume for the purposes of our consideration here to be somewhat akin to the "last clear chance" doctrine, but not precisely the same
 In Swink, the court instructed on "discovered peril," but did not instruct on whether "the actual discovery by defendant's agents of his (plaintiff's) perilous situation (was) in time to have averted . . . injury to him (plaintiff)," (p. 197), an essential element of the discovered peril doctrine.
 Since the jury found the defendant was "convicted (sic) of primary negligence, and Swink convicted of contributory negligence, the judgment of the trial court should have been for petitioner" (original defendant), and the judgment for plaintiff was reversed. (This opinion was adopted by the Texas Supreme Court.)
 
 
 [8]
 First, where the defendant did not actually see the peril of the plaintiff, but by keeping a reasonable careful lookout should have seen the peril of the plaintiff and by the exercise of reasonable care have thereafter avoided the injury. In this situation the doctrine only applies when the plaintiff's negligence has terminated or culminated in a situation of peril from which he could not, by the exercise of reasonable care, extricate himself. Gray v. Woods, 84 Ariz. 87, 324 P.2d 220 (1958); Hirsh v. Manley, supra; Restatement of the Law, Torts, § 479
 It is significant to note that the situation of danger or position of danger referred to in the authorities dealing with the last clear chance doctrine, is reached only when a plaintiff, moving toward the path of an oncoming object has reached a position from which he cannot escape by the exercise of ordinary care.
 ' . . . Where the defendant does not actually know of the plaintiff's situation of peril, the doctrine can only properly be applied where the plaintiff has gotten into a position of inextricable peril. An illustration of this is where a person has caught his foot in a railroad switch, or is in some other similar predicament, so that he is thereafter unable to avert the injury. In such a situation, the plaintiff's negligence has come to rest. In such circumstances the defendant may be held responsible if he either knows, or in the exercise of reasonable care should know, of the plaintiff's helpless situation in time to avoid the injury and fails to do so.
 'In regard to the application of this principle, the plaintiff here is faced with a dilemma: she was either in inextricable peril or she was not. If she was not in inextricable peril, then at any instant up to the time she got into such predicament, by the exercise of reasonable care, she could have observed the oncoming car and have avoided being hit. On the other hand, she could only have gotten into inextricable peril by getting into the path of the defendant's car, and her peril could be considered inextricable only if the defendant was then too close to avoid striking her. Thus, by the very description of the situation, he did not have "the last clear chance" to avoid the injury. As the phrase indicates, it must be a fair and clear opportunity and not be a mere possibility that the collision could have been avoided.' Fox v. Taylor, 10 Utah 2d 174, 350 P.2d 154, 156-57 (1960).
 Certainly, in this case, plaintiff's negligence had not terminated and it would seem equally certain that it had not culminated in a situation of peril from which he could not extricate himself. The facts disclose that plaintiff, without looking, left the sidewalk and was running, with his back to oncoming traffic, up the right side of the street at about a foot and a half from the curb and then angled over a few more feet into the street before being struck by the defendant's automobile. If he had been vigilant it would have been his duty to have stepped off the street at any instant and to have avoided the injury. Plaintiff's negligence therefore never terminated nor culminated in a situation of peril from which he could not extricate himself by the exercise of ordinary care.
 It is argued that one who is oblivious to his danger is, in effect, as unable to extricate himself as one who is physically unable to do so. In applying the doctrine of last clear chance we are not exclusively concerned with the negligence of the defendant in the action. We are primarily concerned with the party who seeks to have his own negligence excused by the application of the doctrine. The negligence of the man who is physically unable to extricate himself, after getting his foot stuck in the road, has terminated. But the man walking or running on the wrong side of the road and not on the sidewalk in disobedience of the statute A.R.S. § 28-796 and oblivious to his danger in so proceeding is negligent, Coe v. Hough, 42 Ariz. 293, 25 P.2d 547 (1933), until and at the very moment of his injury. If we were to accept the theory urged it would mean that a plaintiff should be in a better position to have his negligence excused under the last clear chance rule if he took no care whatsoever for his own safety than if he kept careful watch for cars coming from behind. We cannot accept the theory that one who is oblivious to his danger is as unable to extricate oneself as one who is physically unable to do so.
 Second, an oblivious or inattentive plaintiff not in a position of danger can only avail himself of the doctrine of last clear chance where the defendant actually saw the plaintiff or the peril of the plaintiff and should have appreciated the danger and thereafter fails to exercise reasonable care to avoid the injury. Restatement of the Law, Torts, § 480. Under this section of the Restatement dealing with an inattentive plaintiff we are only concerned with whether the defendant actually saw the plaintiff. If a defendant actually sees the plaintiff the doctrine applies although the plaintiff's negligence continues up to the instant of the injury and never terminates or culminates in a position of peril. The application of the rule in a situation such as this needs no support outside of simple considerations of humanity. Any other view would condone wilful and wanton injury. Odekirk v. Austin, 366 P.2d 80, 82-83 (1961).
 
 
 [9]
 As counsel for appellee originally requested an instruction on the last clear chance doctrine, paragraphs 2, 3 and 4 thereof each referred to "defendants County of Maricopa and Francisco Espinoza." The trial court struck the "s" from defendant, and the words "and Francisco Espinoza" from each numbered paragraph, and inserted "to the County of Maricopa" after "apply" in the first line
 
 
 [10]
 The language "further harm" is unfortunate. Does that phrase assume that the single defendant, County of Maricopa, had originally harmed decedent, and then inflicted harm further, in point of time? Or, that other defendants had injured plaintiffs' decedent, originally, but that the County of Maricopa subsequently (and perhaps additionally), had harmed decedent?
 
 
 [11]
 The one case cited in appellant's Opening Brief in support of this proposition is Atlantic Coast Line R.R. Co. v. Coxwell, 93 Ga.App. 159, 91 S.E.2d 135 (1955)
 
 
 [12]
 The issue of contributory negligence, remember this, ladies and gentlemen. Mr. Cracchiolo is banging away at us because Mr. Rosengren is going to argue this and the other thing. Contributory negligence, of course, is taken care of by the last clear chance instruction which, when you hear it in the scheme of all of the instructions, you will find is completely applicable to the County. But in any event, the rationale of our contributory negligence law in Arizona is that the defense is left to the jury and the jury doesn't have to apply that defense unless they elect to do so
 You have great latitude and you have great power, and the reason you have that is the Constitution specifically empowers the jury to have those extra powers when it comes to invoking it, because it is a harsh doctrine, so it carries with it some equitable considerations and you have the right to decide what the equities are as regards the lawsuit and whether these are worthy people and whether they did, indeed, love their son and whether or not there was the kind of family atmosphere that you feel comports with the style and the class which ought to be in the United States District Court and command the type of a group of citizens to come in here for two solid weeks and hear the evidence." (Mr. Rosengren's rebuttal argument, R.T. D-194-195).
 
 
 [13]
 "In applying the rule of Erie v. Tompkins, it is not the function of the district court to draw fine distinction not suggested in a state court opinion." 36 C.J.S. Federal Courts § 176
 
 
 [14]
 (a) From the American Bar Association, Code of Professional Responsibility, effective 1/11/1970: "DR-7-106 Trial Court Disciplinary Rules
 C. In appearing in his professional capacity before a tribunal, a lawyer shall not:
 (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case, or is not supported by admissible evidence.
 (2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.
 (3) Assert his personal knowledge of the facts in issue, except when testifying as a witness."
 (b) From Canon 22 of the ABA Canons of Professional Ethics, 1957, p. 22:
 "The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness . . .
 "A lawyer should not offer evidence which he knows the court should reject in order to get the same before the jury by argument for its admissibility . . . It is unprofessional and dishonorable to deal other than candidly with the facts in . . . the presentation of causes.
 "These and all kindred practices are unprofessional and unworthy of an officer of the law, charged, as is the lawyer, with the duty of aiding in the administration of Justice."
 (c) From Ariz.Rev.Statutes, § 32-263 Duties of Attorney.
 "4. to employ for the purpose of maintaining causes confided to him such means only as are consistent with truth, and never seek to mislead the judges by any artifice or false statement of fact or law."
 (d) Cr. West's Ann.Calif.Bus. & Prof.Code, § 6068; and Amer.C.T.L., 19(g).
 
 
 [15]
 There is nothing in the record before us to prove Dr. Tuchler's alleged admission that plaintiffs' lawyer "had a good case" was ever said by Dr. Tuchler
 Immediately after the question was asked, Mr. Cracchiolo, then counsel for Dr. Espinoza, objected, and the trial judge vigorously ruled that Mr. Rosengren had made an "entirely improper remark", having "nothing to do with the relevancy of this case whatsoever," etc.
 Mr. Cracchiolo then moved for a mistrial (R.T. C-101). Mr. Beale, for the City of Phoenix, joined in Mr. Cracchiolo's objection as did Mr. Maud, for the County of Maricopa (R.T. C-102).
 At that time Mr. Cracchiolo stated: "I was there (at the deposition) and Mr. Beale was there and it (the alleged statement) was never made."
 Mr. Maud then noted that the alleged statement "was purely conjection and purely conclusionary" "even had that statement been made."
 Mr. Rosengren then asked to be heard, and said: "If the Court please, we took this deposition. That is the remark that the witness made." (R.T. C-103).
 The following then occurred:
 THE COURT: Why didn't you put it on the deposition, put it in the record, then?
 MR. ROSENGREN: Just a second, sir. The court reporter called me subsequently and conferred with her associates, not knowing whether the doctor has got authority or jurisdiction to interrupt the thing, and the court reporter made that decision. It wasn't
 THE COURT: You had an opportunity to read the deposition.
 MR. ROSENGREN: It wasn't my decision.
 THE COURT: You had an opportunity to supplement by further questioning, if anything was left out, and you didn't do it.
 MR. ROSENGREN: I could have done that.
 THE COURT: I am going to take the matter under advisement. I think you are inviting additional Duniway comment like the last one. Go ahead and finish your redirect examination.
 MR. ROSENGREN: May we have one more, for the record, to complete our argument?
 THE COURT: Make all the record you want.
 MR. ROSENGREN: For the Court's consideration, I'd like you to know, and for the benefit of counsel, in having approached the problem in this manner, that I checked with the court reporter on the precise and exact words proffered by the witness. The court reporter read me the words over the phone "Come on, Ken, you've got a damned good case and you know it."
 Now, I have in good faith tried to keep good faith with the Court and I listed the court reporter as an impeaching witness, together with her notes.
 MR. BEALE: The jury is listening to this.
 THE COURT: Look, you are talking about this not as a matter of impeaching his entire testimony but a jocular statement off oath which may have related to sympathy, which may have related to anything under the sun other than his testimony in this case, and it is not going in the record.
 MR. ROSENGREN: Thank you, sir.
 Thus, the statement was not in the deposition. Had it been said, Mr. Rosengren acknowledged that he could have had it put in. He did not do this, but resorted to the strategy he adopted, still insisting his method was proper, despite the strong opinion of other lawyers and judges.
 It is of more than passing interest to note that in resisting appellant's Motion for a New Trial, Mr. Rosengren took the same position he took on oral argument before this Court, i. e., that he had done no wrong that the trial judge was too severe with him (he described the judge's remarks as "intemperate"); and that he had been unfairly criticized by Judge Duniway in another case "for planting corn in a Federal courtroom." He then represented to the trial judge (with respect to the Duniway criticism):
 "The irony of the situation is that plaintiffs' counsel was at that time doing nothing more than using, without paraphrasing, the beautiful words from An Almanac of Liberty written by Justice William O. Douglas when he authored his famous book in 1954. See attached letter from Justice Douglas to plaintiffs' counsel marked Exhibit 1."
 The foregoing statement is in error, as we point out, hereafter in this opinion.
 
 
 [16]
 Mr. Rosengren has practised law in Arizona since 1947, and he has been admitted to the Supreme Court Bar; is a member of the A.B.A., the Maricopa County Bar Association; the State Bar of Arizona; the Association of Trial Lawyers of America; American Judicature Society; American Board of Trial Advocates; and California Trial Lawyers' Association. He has been Chairman of several Trial Committees, and an officer (at times a national officer) in such organizations. He is the author of legal articles (See Martindale-Hubbell Law Directory, 1975, Vol. I, p. 351 B)
 
 
 [17]
 Exhibit A was in the record before us because it was supplied to the district court judge attached to a memorandum filed in opposition to appellant's Motion for a New Trial. (C.T. 532)
 
 
 [18]
 Mr. Rosengren, at oral argument before this Court said: "The question was asked in the heat of battle I have (sic) three lawyers against me."
 Later, in the same argument, counsel for appellees said:
 "I thought it was a proper question, your honor. I went to the best trial lawyers in Phoenix, and it really concerned me."
 Again, later in the same argument to this Court, counsel for appellees adopted a different position, and said:
 "I am, I think entitled to propose a question to the witness fully and completely, and get it out of my mouth, and let counsel have the opportunity to object and then have the witness answer."
 Here, counsel overlooks the duty of the trial judge to rule on the validity of the question prior to any prejudicial matter being heard by the jury, if that be possible.
 Here it was impossible.
 Mr. Rosengren also noted in oral argument before this panel that he himself had at the trial requested in chambers the trial judge for a mistrial, after the judge, in Mr. Rosengren's own words, had "castigated me," had said he "was disappointed in the lawyer for having asked the question, and I still bear scars from his excoriating dressing down in front of the jury. . . ."
 I told Judge Copple that he was far too strong far too vitriolic with counsel . . . when the judge tells the lawyer in no uncertain terms that he is behaving like a charlatan, that is a terrific sting. We had it out. . . . There was a spirited give and take. (Mr. Rosengren tape of oral argument).
 Then in a generous attitude toward the trial judge, Mr. Rosengren told this panel:
 Judge Copple appreciated and realized that he had gone a wee bit too far. This certainly should not be a matter of concern at this level, I would not think. (Tape of oral argument).
 
 
 [19]
 The Supreme Court of Arizona in Mayo v. Ephrom, supra, also considered the efficacy of an attempt to cure error by giving curative instructions to the jury. "Whether a curative instruction cures the harm caused by the impropriety of a remark is debatable." (p. 817)