**Connie DIAS, Plaintiff–Appellee,**

v.

**SKY CHEFS, INC.,**
**Defendant–Appellant.**

No. 89–35778.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1990.

Decided Nov. 27, 1990.

Walter V. Siebert and Susan K. Grebeldinger, Sherman & Howard, Denver, Colo., for defendant-appellant.

Richard C. Busse and Donald B. Potter, Law Offices of Richard C. Busse, Portland, Or., for plaintiff-appellee.

Before FLETCHER, FERGUSON and FERNANDEZ, Circuit Judges.

FERGUSON, Circuit Judge:

Sky Chefs, a Delaware corporation, appeals from a jury verdict finding it liable for the actions of its Portland, Oregon general manager, Mr. Tony Nathalia. The jury found that Nathalia sexually harassed women employees and intentionally inflicted emotional distress upon and ultimately wrongfully discharged a woman employee, Ms. Connie Dias, for resisting that sexual harassment. We affirm.

## I.

Sky Chefs, Inc. is a Delaware corporation headquartered in Dallas, Texas. It maintains a number of regional facilities in the United States, each of which is directed locally by a General Manager. In Portland, the General Manager is responsible for "general supervision" of approximately 230 employees. The company supplies meals to airlines.

Dias began work at the Portland, Oregon facility in April 1985 as a clerical worker in the billing department. In September 1986 she was promoted while working under General Manager Jim Durham. Later that month, Nathalia replaced Durham as the Portland General Manager. Nathalia had been transferred by the company from its San Diego facility, where he had also served as General Manager.

According to Dias and other witnesses at trial, Nathalia upon arrival engaged in ongoing sexual harassment of women employees. The harassment included daily comments on the breasts, buttocks, and physical appearance of individual women; suggestions to women that they show Nathalia "a good time" and treat him as well as the women employees in the San Diego facility had treated him; staff meetings at which he established job standards for women employees that included the wearing of dresses or skirts, nylons and heels specifically so that he could admire women employees' legs. Nathalia denied these allegations at trial.

Dias asserted that she refused to wear nylons and heels and confronted Nathalia about the dress standards; that she complained to lower-level supervisors about Nathalia; that she acted as a spokesperson for other women employees in complaining to local supervision about the sexual harassment. She alleged that particularly after complaining to Office Manager Tom Illk, Nathalia began to make numerous remarks to Dias complaining about her personal appearance and criticizing her work performance. She alleged that Nathalia changed her work location, instructed her not to talk with women in other departments, "overscrutinized and sabotaged her work; directed supervisors to discipline her for trivialities; interfered with her receipt of benefits; [and] had her followed." Dias alleged that this treatment caused her severe emotional distress. In June 1987 she fell at work, injuring herself. She filed a workers' compensation claim and took a leave of absence. Her physician released her for a limited duty return to work as of December 7, 1987, with a recommendation that she gradually increase her hours to full-time work. However, upon her return to the office on December 7, Dias alleged that her supervisor informed her that her position had been eliminated, that the company had no work for her, and per General Manager Nathalia's recommendation, Dias was terminated.

Following her termination, Dias filed suit in federal district court, which had diversity jurisdiction under 28 U.S.C. § 1332. She alleged three claims: wrongful discharge for protesting the sexual harassment of her co-workers; intentional infliction of severe emotional distress; and discrimination against her for having applied for workers' compensation benefits. The jury found for Sky Chefs on the workers' compensation claim, but found for Dias on the wrongful discharge and intentional tort claims. The jury awarded Dias $125,000 in general damages and $500,000 in punitive damages.

Sky Chefs filed a post-trial motion for judgment notwithstanding the verdict, which was denied. It now appeals, asserting the following:

(1) The evidence could not, as a matter of law, support a finding of liability for wrongful discharge or intentional infliction of emotional distress;

(2) Punitive damages could not be awarded in this case as a matter of law; and the general damages were excessive;

(3) Sky Chefs is entitled to a new trial, because of misconduct by Dias' attorney and because of various mistakes by the trial court;

(4) Sky Chefs was denied a fair trial because the only three men in the jury venire were struck by peremptory challenge, leaving an all-woman jury.

We address the claims sequentially.

II.

■ We will reverse a jury finding of liability only if "without weighing the credibility of the witnesses, the evidence and its inferences, considered as a whole and viewed in light most favorable to the [prevailing] party ... can support only one reasonable conclusion...." *Davison v. Pacific Inland Nav. Co., Inc.,* 569 F.2d 507, 509 (9th Cir.1978); *see also Walker v. KFC Corp.,* 728 F.2d 1215, 1223 (9th Cir. 1984). Since this is a diversity action, we apply the law of Oregon to the claims of wrongful discharge and intentional infliction of emotional distress. *County of Maricopa of State of Ariz. v. Maberry,* 555 F.2d 207, 210 (9th Cir.1977).

### A. Wrongful Discharge.

Under Oregon law,

> [T]he common law rule for "at will" employment prevails unless the employe is discharged while pursuing a right related to his or her role as an employe and the right is one of important public interest indicated by constitutional and statutory provisions and caselaw.... We have stated that sexual harassment on the job is a forbidden discriminatory act under state and federal law and an employe has a legal right which is of important public interest not to be discharged for resisting sexual harassment on the job.

*Holien v. Sears, Roebuck & Co.*, 298 Or. 76, 689 P.2d 1292, 1300 (1984).

■ Dias alleged that she was discharged principally for "resisting sexual harassment on the job." At trial a number of witnesses testified supporting the allegations of sexual harassment and of Dias' resistance to it. A jury could have concluded that her firing was caused by her actions involving this "important public interest."

### B. Intentional Infliction of Emotional Distress.

■ Under Oregon law the general requirements for this tort action are as follows:

> To succeed on a claim for the intentional infliction of severe emotional distress plaintiff must show that (1) defendant intended to inflict severe emotional distress on plaintiff; (2) defendant's acts did in fact cause plaintiff to suffer severe emotional distress; (3) defendant's acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct."

*Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 733 P.2d 430, 436 (1987).

■ The standards for intent and for socially tolerable conduct depend on the type of relationship which exists between plaintiff and defendant. "[A]n employer-employee relationship ... imposes a greater obligation to refrain from inflicting mental distress than the obligation which exists between strangers." *Trout v. Umatilla Co. School District*, 77 Or.App. 95, 712 P.2d 814, 818–819 (1985).

■ The Oregon Supreme Court has held that "the duty to refrain from abusive behavior in the employment relationship comes closer to that of the physician toward a patient ... than to that of ... police officers toward a citizen not in custody and free to terminate the encounter...." *Hall v. May Dept. Stores Co.*, 292 Or. 131, 637 P.2d 126, 131 (1981).

■ As to intent, the key inquiry is "whether the jury could find that [the company agent] attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part." *Id.* 637 P.2d at 131; *see also id.* 637 P.2d at 134 n. 4. In this case Dias need not show that the employer's actions were intended to cause the specific psychological injury which resulted, so long as plaintiff showed that those actions were a tactic designed to stifle opposition to sexual harassment. The plaintiff so argued and a jury could reasonably have agreed.

As to the standard of "outrageousness" in the employment context, "the key focus ... is not on the result, but on the purpose and the means used to achieve it." *Patton v. J.C. Penney Co.*, 301 Or. 117, 719 P.2d 854, 858 (1986). The defendant's behavior must be distinguishable from "the insults, ill temper, and offensive jokes that persons are expected to endure under contemporary standards of behavior." *Id.* (quoting *Brewer v. Erwin*, 287 Or. 435, 600 P.2d 398, 411 (1979)).

In cases such as *Patton*, 719 P.2d at 858, and *Snyder v. Sunshine Dairy*, 87 Or.App. 215, 742 P.2d 57, 58 (1987), the Oregon courts have held that "rude" or "tyrannical" behavior by supervisors, or excessive supervision and unjustified reprimands, *when occurring in the context of discharges not invoking any significant public interest,* could not in themselves give rise to an intentional tort claim. At the same time, the outrageousness of the conduct is measured not merely by the severity of the acts themselves but also by the

context in which the acts are committed. For example, in *Turman v. Central Billing Bur., Inc.,* 279 Or. 443, 568 P.2d 1382, 1385 (1977), a case involving abuse of a debtor by a bill-collector, the outrageousness of the bill-collector's acts was judged not only by the collector's external acts—abusive language over the phone—but also by the contextual facts that the collector knew the debtor had made some payment on the bill, and that the debtor was impoverished and blind. *Id.*

In Dias' case, the injury she suffered is distinguishable from ordinary employment abuses because it was carried out in the context of an allegedly sexually abusive work environment intentionally established by Sky Chefs' local general manager. The jury was entitled to consider that context and the intent behind the manager's specific acts in its determination of outrageousness. *See Hall,* 637 P.2d at 133 n. 3 ("permissible" acts may become impermissible if done with illicit intent and knowledge of predictable illicit result).

### C. *Respondeat Superior.*

Defendant claims that the company should not be held liable for Nathalia's acts, because any sexual harassment committed was Nathalia's sole responsibility.

██ An employer is liable for the torts of an employee if the employee acts within the scope of employment. *Stanfield v. Laccoarce,* 284 Or. 651, 588 P.2d 1271 (1978). Generally, whether an employee acts within the scope of employment depends on three factors:

(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform.

*Chesterman v. Barmon,* 305 Or. 439, 753 P.2d 404, 406 (1988) (citing *Stanfield v. Laccoarce,* 284 Or. 651, 588 P.2d 1271 (1978) and *Gossett v. Simonson,* 243 Or. 16, 411 P.2d 277 (1966)).

██ Clearly the specific egregious act giving rise to an intentional tort claim will itself rarely be "of a kind which" the employee was hired to perform;" the appropriate inquiry is whether the employee committed the tort while performing, or in connection with, his job responsibilities. *See, e.g.,* Holtzman and Trelz, *Recent Developments in the Law of Sexual Harassment: Abusive Environment Claims after Raritor Savings Bank v. Vinson,* 31 St. Louis U.L.J. 239, 276 (1987) ("Sexual harassment simply is not within the job description of any supervisor or any other worker in any reputable business."). The Oregon Supreme Court has discussed this issue in the following way:

In *Fields v. Lancaster Cotton Mills,* 77 S.C. 546, 58 S.E. 608 (1907), a corporation was held liable when the superintendent of a cotton mill directed and participated in the assault of one who sought to lure cotton mill employees to other jobs. The court held that Lancaster Cotton Mills was liable for the acts of the superintendent because he was entrusted with the control of its policies and the methods to be employed to prevent interference with its employees ...

. . . . .

[T]he corporation is liable for the acts of one entrusted with the control of the company policy if the act was in the execution of a corporate function....Newer cases reflect the concept that by giving one powers of management, the corporation "must be held to have invested him with authority to make decisions for it, when necessary, in connection with the performance of those duties. When made, the [employee's] judgment becomes the judgment of the defendant."

*Chesterman,* 753 P.2d at 408 (Peterson, C.J., concurring) (citations omitted).

██ In the present case, Sky Chefs acknowledges that in his capacity as General Manager, the highest-ranking corporate officer in Portland, "Nathalia was its agent for such purposes as general supervision of Dias and others." Sky Chefs further asserts that "Nathalia's motivation with re-

spect to Dias was to obtain improved work performance." The jury reasonably could have concluded that Nathalia viewed Dias' resistance to sexual harassment as undercutting his approach to furthering discipline and productivity among women employees. The jury reasonably could have concluded that Nathalia's treatment of Dias, including her discharge, was thus in furtherance of his administrative responsibilities and within the scope of his employment, despite the fact that his approach was misguided and contrary to public policy.

### III.

 Sky Chefs seeks review of the damage awards. "The jury's verdict should be accepted if it could reasonably have been reached" and a trial court's decision against remittitur is reversed only on a showing of "clear abuse of discretion." *Raynor Bros. v. American Cyanimid Co.,* 695 F.2d 382, 385 (9th Cir.1982).

### A. *Punitive Damages.*

 "The rationale for allowing punitive damages is to punish the offender and to deter others from similar conduct." *Honeywell v. Sterling Furniture Co.,* 99 Or.App. 94, 781 P.2d 379, 380–381 (1989).

Sky Chefs argues that the conduct alleged was not sufficiently aggravated to justify punitive damages as a matter of law. But as the Oregon Supreme Court has stated,

> [I]t seems clear that in a jurisdiction which generally allows punitive damages for grave intentional torts, punitive damages in principle are allowable when an "extraordinary" or "extreme" transgression of social norms is an indispensable element of the tort itself. When the jury is correctly instructed on that element of liability as well as on compensatory and punitive damages, and there is evidence to support its verdict as to liability, this tort leaves little room to scrutinize the facts for an additional degree of aggravation to support punitive damages.

*Hall,* 637 P.2d at 134–135.

 Sky Chefs does not allege that the jury was improperly instructed either on the standard of liability or on the standard for awarding punitive damages. Further, Oregon law has long held that punitive damages may be awarded when a company agent is "employed in a managerial capacity and [is] acting in the scope of employment." *Stroud v. Denny's Restaurant, Inc.,* 271 Or. 430, 532 P.2d 790, 791 (1975); *see also* Hodel, *The Doctrine of Exemplary Damages in Oregon,* 44 Or.L. Rev. 175, 233 (1965). Given the importance of deterring corporate practices, including hiring decisions, which permit abuse of women who resist sexual harassment on the job, we find nothing in this record to indicate that "the amount of the verdict is 'outrageous,' 'shocking' or 'monstrous'." *Oliver v. Burlington Northern, Inc.,* 271 Or. 214, 531 P.2d 272, 274 (1975). A jury could reasonably have concluded that the punitive damage award was an appropriate penalty and deterrent.

### B. *General Damages.*

 Sky Chefs alleges that Dias' damages are compensable and preempted by the Oregon Workers' Compensation Act. Damages for intentional torts are not preempted. *Palmer v. Bi–Mart Co.,* 92 Or.App. 470, 758 P.2d 888, 891 (1988).

 Sky Chefs asserts that Dias' calculation of her non-economic damages, including treatment by a psychiatrist, was "not credible." Dias alleged that she was caused severe emotional distress on the job during Nathalia's tenure. She alleged that she had never been discharged before, that after discharge she became depressed, suffered eating and sleeping disorders, and has had psychological difficulty returning to the workforce, resulting in her receiving welfare assistance for the first time in her life. She has had ongoing and regular treatment by a psychologist, and has incurred all medical bills since her discharge without medical insurance. In light of these allegations and our deference to the jury's decision, we find Sky Chef's simple assertions inadequate to justify overturning the jury verdict.

## IV.

 Sky Chefs also seeks a new trial, alleging reversible errors by the trial court and misconduct by plaintiff's attorney. Trial court rulings on evidentiary matters, and on whether there has been attorney misconduct, are reviewed for abuse of discretion. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985); *County of Maricopa of State of Ariz. v. Maberry*, 555 F.2d 207, 219 (9th Cir.1977).

### A. *Evidentiary Rulings.*

 First, Sky Chefs asserts that all testimony regarding sexual harassment which Dias did not specifically protest should have been excluded. Sky Chefs cites to *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984), which is inapposite. *Haskell* was an Age Discrimination in Employment Act (ADEA) case, not an intentional tort case, in which testimony by plaintiff's co-workers on age discrimination was submitted in an improper attempt to show a "pattern and practice" of age discrimination. *Id.* at 121–122. The standards of relevance in Dias case are entirely different. Admitted testimony on discussions of sexual harassment not directly protested by Dias, to which Sky Chefs' objects, was relevant both to show Sky Chefs' awareness of and failure to rectify the harassment, and to show the basis for and significance of the protests which Dias did in fact make.

 Secondly, Sky Chefs asserts that Dias' attorney asked questions about incidents of sexual harassment without first establishing that Dias had knowledge of those incidents. Sky Chefs asserts that this was in violation of the court's order to "exclude the testimony by Dias of incidents of sexual discrimination not witnessed by her or not related to her while she was on the job because it's the job environment that is at issue here."

The trial court ruling at issue was directed at Dias' personal testimony. With regard to the testimony of others, and the court's attempts to limit testimony about sexual harassment to statements familiar to Dias, the court stated, "I'll try to carve out a rule and then within that rule there may be other objections at the time and I'll have to rule on those ... and then within that broad ruling you'll have to make other objections." On some occasions, the trial court permitted plaintiff's attorney to establish Dias' knowledge of specific incidents of sexual harassment *after* questions were put to witnesses about harassment, rather than *before*, by way of foundation. The trial court's decision on this matter, as on the remaining issues objected to by Sky Chefs, was within its discretion.

### B. *Attorney Misconduct.*

Sky Chefs also alleges that Dias' counsel repeatedly asked objectionable questions beyond the limits of the court's orders described above, and that this constituted attorney misconduct. However, given the justifiable flexibility of the court's rulings, there is no indication of deliberate disregard of the court's orders. Nor is there any showing that Dias' attorney intentionally introduced evidence which he knew was improper. *Cf. Maberry*, 555 F.2d at 217–218. Therefore, these claims also must fail.

## V.

 Finally, Sky Chefs asserts that its Fifth Amendment rights were violated by the plaintiff's use of peremptory challenges to strike three males from the jury venire, leaving an all-woman jury, relying on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We review this issue of law *de novo*, *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We pay it particular attention since this court has recently extended the *Batson* equal protection right to gender-based peremptory challenges in criminal cases. *United States v. De Gross*, 913 F.2d 1417, 1423 (9th Cir. 1990).[1]

---

**1.** *De Gross* was decided on September 10, 1990, after briefing in *Dias* had already been complet-

ed. However, Sky Chefs may be entitled to the benefit of the rule announced in *De Gross* under

For fifteen years, it has been clear that the systematic exclusion of women from jury *venires* is a form of gender discrimination which violates the "fair cross-section" guarantee of the Sixth Amendment in criminal cases. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). This holding was reaffirmed by the Supreme Court just last term, in *Holland v. Illinois*, —— U.S. ——, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990): the Sixth Amendment "entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs." *Id.*, 110 S.Ct. at 805 (citing *Taylor*). Of course, Sky Chefs has not and cannot claim this privilege under the Sixth Amendment, since defendants in *civil proceedings*, whether black, white, male, female, or corporate, do not enjoy Sixth Amendment rights.

However, since 1986, black criminal defendants have also enjoyed the right to object to purposeful discrimination through the use of peremptory challenges against members of their own race, under the equal protection clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This right is based on ethnic group membership rather than status as a criminal defendant; however, it has never been extended to civil cases, to corporate defendants, or to cross-racial peremptory challenges in this circuit.[2]

Like Batson, Sky Chefs claims that its Fifth Amendment right to equal protection was violated by the plaintiff's exercise of peremptory challenges allegedly based on gender. *See United States v. De Gross*, 913 F.2d 1417, 1423 (9th Cir.1990). But the confines of this equal protection right are narrow. To assert such a claim the petitioner must either be a member of the constitutionally protected class being excluded, *Batson*, 476 U.S. at 86, 106 S.Ct. at 1717, or must be asserting the rights of the excluded jury members, rather than his or her own rights, *De Gross* at 1420.

Petitioner, a corporation, cannot claim to be a member of the constitutionally protected class allegedly excluded from the jury, i.e., males.[3] We need not reach the question of whether or not males are a constitutionally cognizable "suspect class" since defendant is not even a member of that class. Although the Court has yet to rule on "whether a defendant's race affects

---

the familiar principle that a judicial decision affecting federal civil law applies retroactively, unless it would produce "inequitable results." *Reed v. Hoy*, 909 F.2d 324, 327 (9th Cir.1989); *Chevron Oil v. Huson*, 404 U.S. 97, 106–08, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) (discussing factors to consider in determining whether a decision should apply only prospectively). For the purposes of this case, we assume without deciding that *De Gross* applies retroactively.

In extending the *Batson* equal protection right to gender-based challenges, *De Gross* broke new ground by also allowing a prosecutor to object to a defendant's peremptories. *De Gross* at 1423. However, the panel was careful to point out that the U.S. Attorney had standing to assert this right only on behalf of the *excluded juror*, not the government. Therefore, *De Gross* itself affords no new rights to civil defendants or plaintiffs, such as Sky Chefs or Dias. *Id.* at 1420 & n. 5.

**2.** *See, e.g. United States v. Vaccaro*, 816 F.2d 443 (9th Cir.1987), *cert. denied* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220. It should be noted that the Supreme Court has recently emphasized the distinction between *Taylor's* Sixth Amend-

ment-based "fair cross-section" right, which guarantees a representative jury venire regardless of the defendant's race or sex, and the *Batson* equal protection right, which covers race-based peremptory challenges, and ensures only that members of a defendant's *own race* may not be discriminatorily excluded from her jury. As Justice Scalia commented, "[t]he Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a representative jury (which the Constitution does not demand), but an impartial one (which it does)." *Holland* at 807.

In *Holland* itself, however, several Justices expressed their readiness to extend *Batson* to peremptory challenges which operate on racial lines, regardless of the defendant's race. *See Holland*, 110 S.Ct at 811 (Kennedy, J., concurring), 813 (Marshall, J., dissenting) & 821 (Stevens, J., dissenting). Should such an extension occur, however, there is no reason to assume that it would apply to corporate defendants, to gender-based claims, or to civil cases.

**3.** The transcript indicates that three men and five women were struck from the jury by peremptory challenges, but not which side struck which juror. Record at 40–41.

his standing to invoke *Batson*", *Holland* at 814 (Marshall, J., dissenting), we are aware of no authority that in an individual case a corporation (or even a male defendant) is entitled, under the equal protection clause, to a jury of any particular gender. *Cf. Apodaca v. Oregon,* 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972).

Even if *Batson* were to be extended to allow black defendants to challenge peremptory strikes of white venirepersons or vice versa, *see Holland* at 811–812 (Kennedy, J., concurring), 813–814 (Marshall, J., dissenting), 821–822 (Stevens, J., dissenting), it does not logically follow that corporations would be allowed the same latitude. Nothing in equal protection jurisprudence suggests that corporations should be considered a suspect class meriting heightened judicial review. *See, e.g., Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). Sky Chefs has made no attempt to show that the peremptories were irrational or discriminatory against corporations as a class.

Peremptory challenges are an important aspect of the trial process, as *Holland* emphasizes:

> The tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone.... Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of 'eliminat[ing] extremes of partiality on both sides,' thereby 'assuring the selection of a qualified and unbiased jury.'

*Id.* at 808–809 (citations omitted). Such goals clearly supply a rational basis for the tradition of allowing peremptory challenges in civil jury trials. Since the corporation cannot claim that members of its own "race" were discriminatorily excluded,

Dias' peremptory challenges did not violate Sky Chef's equal protection rights under *Batson*.

However, this does not end the inquiry. We must also examine whether petitioner has standing under *De Gross* to assert the equal protection rights of the excluded jurors themselves. *See De Gross* at 1420. Ms. De Gross appealed her conviction on criminal charges of transporting aliens, claiming that the district court erred in denying her peremptory challenge of a male venireperson.[4] The government's objection to the peremptory was sustained, and we affirmed the trial court's decision, after concluding that the government did have standing to make the objection, based not on its own rights but on the rights of the excluded juror and on the government's unique position as guardian and defender of the jury system.[5] Three factors were considered by the *De Gross* court in granting third-party standing to the U.S. Attorney on behalf of the excluded jurors: (1) the government has a sufficient relationship to the venireperson to ensure vigorous defense of their rights, (2) excluded venirepersons are effectively deterred from asserting their own rights, and (3) the United States as a whole suffers an injury when the venireperson's rights are violated in a criminal case, since the entire jury system is impugned and the government's interest in fair trials is injured. *Id.* at 1421–22.

Third-party standing is generally disfavored by the courts, on both constitutional and prudential grounds. *See, e.g., Valley Forge College v. Americans United,* 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal

---

**4.** De Gross had struck seven men from the venire and the government objected at the eighth. When finally empaneled, the jury consisted of three men and nine women. *De Gross* at 1419.

**5.** The court also found that state action was present, based on the trial judge's ultimate authority over the entire process: "the defendant's action in striking venirepersons is fairly attributable to the state." *Id.* at 1424. *Accord, Fludd*

*v. Dykes,* 863 F.2d 822 (11th Cir.1989) (*Batson* claim available in race-based civil rights action); *cert. denied sub nom. Tiller v. Fludd,* — U.S. —, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989). *Cf. Edmonson v. Leesville Concrete Co.,* 895 F.2d 218 (5th Cir.1990) (en banc) (*Batson* not applicable to civil rights cases because peremptories not "state action"), *cert. granted* — U.S. —, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990).

conduct of the defendant,' " and that the injury is redressable by the courts. *Id.* at 472, 102 S.Ct. at 758. Furthermore, "prudential principles" also mitigate against allowing third-party standing: "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim on the legal rights or interests of third parties." *Id.* at 474, 102 S.Ct. at 760.

As in *De Gross,* the corporation here seeks to extend *Batson* to a gender-based peremptory challenge. However, as we have seen, Sky Chefs has no *Batson* rights of its own. Furthermore, Sky Chefs cannot meet the three-part test established in *De Gross,* which would allow it to take on the government's role and assert the rights of the excluded veniremembers, as did the U.S. Attorney in that case. The second requirement of the three elements is met, since clearly the excluded venirepersons in this case can no more protect their own rights than could the excluded jurors in *De Gross.*

However, Sky Chefs cannot satisfy either the first or the third element. It has no relationship with the venirepersons whatever except to obtain what it perceives to be a panel more favorable to its position. It has no interest in the rights of the venirepersons beyond its own self-interest. Its position is different from that of the government, which has a duty to protect the individual rights of each venireperson. Similarly, the third standing requirement is not met in this case, since Sky Chefs does not suffer any redressible injury when a venireperson's rights are violated. Unlike the U.S. government, a civil defendant has no inherent duty to safeguard the integrity of the judicial process and ensure that "[s]election procedures that purposefully exclude ... persons from juries [do not] undermine public confidence in the fairness of our system of justice." *Holland* at 821 (Stevens, J., dissenting) (quoting *Batson,* 476 U.S. at 87, 106 S.Ct. at 1718). Thus, we hold that petitioner lacks standing to sue on behalf of the male jurors who were allegedly excluded due to their gender.

Having found that petitioner has no standing to raise a claim under either *Batson* or *De Gross,* petitioner's due process claim to an evidentiary hearing examining the motives behind the peremptory strikes must also fail.[6] Since, as a corporate defendant in a civil case, petitioner cannot claim any "fair cross-section" right under *Taylor* or *Holland,* it lacks sufficient racial identity to assert a *Batson* claim, and also lacks standing to assert the rights of the three male venirepersons under *De Gross,* the peremptory challenges must be upheld and the jury's verdict affirmed.

AFFIRMED.

---

**6.** The timeliness of Sky Chefs' objection was also problematic, since it was not raised until after the jury had been empaneled and the remaining venirepersons excused. *See U.S. v. Thompson,* 827 F.2d 1254, 1257 (9th Cir.1987) (*Batson* objections must occur as soon as possible, preferably before jury is empaneled).

Here, the objection was raised only after the jury had been sworn, the court had recessed and reconvened, defendant's motions in limine had been presented and argued, and defendant had noted several other objections. Sky Chefs did not ask the judge to conduct a *Batson* hearing on the issue of discriminatory intent, but merely stated "for the record" that "[w]e think there has been a systematic exclusion of males from the jury and that is evidenced by the list that went back and forth ..." Transcript at 57.

Unlike *Thompson,* this objection could have been raised much earlier, and the plaintiff here was prejudiced by its tardiness. The objection could have been raised when petitioner's lawyer first saw the list of challenged jurors, when the challenged jurors were asked to move to the back of the room, immediately after the jury was sworn in, or when the judge recessed the court. Had the objection been contemporaneous with the voir dire, the court could have requested an explanation from the plaintiff and denied the challenge if no neutral explanation was presented, as he did in *De Gross.* Where, as here, the claimed discrimination is apparent before the close of voir dire, an objection made after jury empanelment is arguably untimely.