**Barbara L. STEINER, Plaintiff–Appellant,**

v.

**SHOWBOAT OPERATING COMPANY, d/b/a Showboat Hotel & Casino, Defendant–Appellee.**

No. 92–16882.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 11, 1994.*

Decided June 10, 1994.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4.

Richard Segerblom, Las Vegas, NV, for plaintiff-appellant.

Malani L. Kotchka, Smith & Kotchka, Las Vegas, NV, for defendant-appellee.

Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.

Opinion by Judge FLETCHER.

FLETCHER, Circuit Judge:

Barbara Steiner appeals the district court's grant of summary judgment in favor of defendant-appellee Showboat Operating Company ("Showboat"), her former employer. Steiner's complaint alleged sexual harassment and retaliation in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"), constructive discharge, and intentional infliction of

emotional distress. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's grant of summary judgment for Showboat on Steiner's sexual harassment and intentional infliction of emotional distress claims, affirm on all other issues, and remand for further proceedings.

## FACTS

Showboat hired Steiner to work as a Blackjack dealer at Showboat Hotel and Casino in March of 1986. Two months later she was promoted to be the casino's first female "floorperson." Her supervisor was Jack Trenkle, a Showboat vice-president.

In 1987, Steiner complained to Showboat management that Trenkle was calling her offensive names based on her gender, such as "dumb fucking broad," "cunt," and "fucking cunt."[1] Trenkle was not reprimanded; rather, Steiner was moved to a different shift so that she would not have to be in contact with him. After about one month, however, she decided the new shift was too inconvenient and moved back to her old shift.

On December 19, 1988, Trenkle learned that Steiner had "comped" a breakfast for two men who had been playing Blackjack at her table. He confronted Steiner in front of customers and other employees, expressing his disapproval of her decision in the following words:

> You are not a fucking floor man [her job]. You are a fucking casino host. You comp every fucking fleabag that walks through the door.

She claims he moved toward her in a threatening manner during this tirade. By his own admission, he then yelled,

> Why don't you go in the restaurant and suck their dicks while you are at it if you want to comp them so bad?

She claims he repeated this two or three times, laughed, and walked off with a grin on his face. Her version is corroborated by the

---

1. Showboat contends that these events fall outside the statutory limitations periods of 42 U.S.C. § 2000e–5(e) and NRS § 11.190(4)(e). Steiner argues they are admissible under Fed.R.Evid. 404(b). The district court has not ruled on their admissibility, and is not required to do so prior to summary judgment. Since, at the summary judgment stage, we view matters in the light most favorable to the non-moving party, we consider Trenkle's 1987 comments here.

deposition of a cocktail waitress who overheard the exchange.

Steiner complained to Showboat's manager the next day, and Trenkle was told to apologize. He did, although Steiner claims it was in a rude and sarcastic manner. Unsatisfied with this response, Steiner filed a complaint with the Nevada Equal Rights Commission (NERC). Once aware of her complaint, Showboat conducted a more serious investigation, in which numerous Showboat employees were questioned about Trenkle's treatment of Steiner and of women generally. Their statements establish that Trenkle was abusive to men and women alike; however, his abusive treatment and remarks to women were of a sexual or gender-specific nature.

As a result of its investigation, Showboat sent a written reprimand to Trenkle for "sexually harassing" Steiner. Trenkle was told that if he ever again used sexual or derogatory language to or about any employee, he would be fired. Trenkle's shift was changed so that he and Steiner would no longer be at work during the same hours.

Steiner claims that Trenkle continued to harass her by showing up for work early, as she was finishing her shift, and making "stares, glares, snickers, and comments." She complained to management, who said security police were watching Trenkle on casino video cameras, but had not yet seen anything incriminating. Management also asked her to transfer to the day shift, so that there would be no chance of meeting with Trenkle. She declined. A few days later, however, she was moved to day shift against her wishes, because "day shift is less demanding and will give you time to perform your job competently and with less stress," so that she could learn to supervise some different games (she could only supervise blackjack), and so that she would not have to be around Trenkle. Letter from G.C. Taylor, Jr. to Barbara Steiner (July 17, 1989).

Steiner said in a conference at NERC that she liked the day shift and was comfortable and less stressed there; however, she asked to be transferred back to her old shift. In September, 1989, Showboat complied with this request, transferring her to swing shift under the supervision of Dean Flurry, who had recently been hired as part of a new management team.

In November, Trenkle was fired because he broke the terms of his disciplinary letter. Specifically, he denied a female employee's request to leave early by saying "I wouldn't want you to lose your job either because you have got big boobs. I'd hate to terminate someone with big boobs." Trenkle Deposition of June 26, 1991, at 12.

In December, the new management team gave all employees evaluations. Steiner received three "Below Standard" marks out of seven categories, primarily because of her alleged inability to supervise any game except blackjack. At least two male supervisors got worse marks than Steiner on their evaluations. Steiner protested her evaluation to Showboat, saying she perceived it to be the first step toward terminating her.

Finally, Steiner claims she was "set up" by her new supervisor, Dean Flurry, in January, 1990. She claims he ordered her to supervise a complicated game of roulette, which he knew she was incapable of doing. When she was unable to properly calculate the payoffs, Flurry publicly ridiculed her. Soon after this, Steiner quit her job at Showboat. She was replaced by a younger woman, Connie Knight.

Steiner then brought suit in district court, claiming sexual harassment and retaliation under Title VII, as well as constructive discharge and intentional infliction of emotional distress. The district court granted summary judgment in favor of Showboat on all claims.

## DISCUSSION

### I. Sexual Harassment

Steiner's claim relies upon the "hostile or offensive work environment" theory of liability for sexual harassment. *See Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–2405, 91 L.Ed.2d 49 (1986). In order to survive Showboat's summary judgment motion, Steiner must show that there are genuine

factual disputes as to (1) whether a reasonable woman would find that Trenkle's conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (2) whether Showboat, once apprised of Trenkle's behavior, failed to take adequate remedial and disciplinary action. *Ellison v. Brady,* 924 F.2d 872, 879, 881–83 (9th Cir.1991).

■ The Supreme Court has recently reconfirmed its "middle path" approach in such cases: while coworkers' occasional annoying or "merely offensive" comments do not constitute sexual harassment, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. Sexual or gender-based conduct which is abusive, humiliating, or threatening violates Title VII even if it does not cause diagnosed psychological injury to the victim. *Id.* at ——, 114 S.Ct. at 371. It is enough, rather, if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.

■ Steiner has established without contradiction that Trenkle habitually referred to her and to other female employees in a derogatory fashion using sexually explicit and offensive terms. Indeed, in describing the episode in which he was fired for stating he would "hate to terminate someone with big boobs," he said "I spoke the same way ever since I have been born, I think." Trenkle Deposition at 13.[2] Moreover, Trenkle's ongoing comments and conduct, and particularly those made to Steiner on December 18, 1988, were sexually explicit, offensive, highly derogatory, and publicly made. *See Harris,*

—— U.S. at ——, 114 S.Ct. at 371 (while a "mere offensive utterance" might not create a hostile environment, conduct which is "humiliating" is more likely to do so).[3] Steiner has made her case,[4] unless Showboat can demonstrate that it took adequate remedial and disciplinary action.

Showboat attempts to meet Steiner's sexual harassment claim, with a two-pronged defense. First, Showboat claims that Trenkle harassed everyone, male and female alike, and therefore his harassment of Steiner was not based on her gender. Appellee's Brief at 18–20. Second, Showboat argues that Steiner could handle—and in fact "welcomed"—Trenkle's abuse, since she herself was "legendary for talking like a 'drunken sailor.'" *Id.* at 4, 20–21. The district court's disposition relies on the former defense. Order of Sept. 23, 1993, at 13–14. Both defenses, however, rely on a misstatement of the undisputed facts and a misunderstanding of the law.

■ The district court erred in endorsing Showboat's argument that Trenkle's conduct was not sexual harassment because he consistently abused men and women alike. In the first place, that argument mischaracterizes his actual behavior. The numerous depositions of Showboat employees reveal that Trenkle was indeed abusive to men, but that his abuse of women was different. It relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct. *See Harris,* —— U.S. at ——, 114 S.Ct. at 369 (defendant called plaintiff a "dumb ass woman," said "you're a woman, what do you know," suggested "negotiating" her raise at the local Holiday Inn, and "jokingly" asked whether she had had sex with clients).

---

**2.** Trenkle's lack of self-control is evident in that he made the "big boobs" comment *after* he had been officially reprimanded for his conduct with regard to Steiner, and had been threatened with termination if he engaged in further acts of sexual harassment.

**3.** The defendant in *Harris* made a comment strikingly similar to Trenkle's: "[w]hile Harris was arranging a deal with one of Forklift's customers, he asked her, again in front of other employees, 'What did you do, promise the guy … some [sex] Saturday night?'" *Harris,* —— U.S. at ——, 114 S.Ct. at 369 (alteration in original).

**4.** We note that Steiner's claim involves both a specific, severe instance of harassment, on December 29, 1989, and allegations of ongoing, sexually derogatory behavior. Because we consider both the severity and the pervasiveness of sexually hostile conduct, we have weighed Steiner's allegations together. *See Ellison,* 924 F.2d at 878 ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct") (citation omitted).

While Trenkle may have referred to men as "assholes," he referred to women as "dumb fucking broads" and "fucking cunts," and when angry at Steiner, suggested that she have sex with customers. And while his abuse of men in no way related to their gender, his abuse of female employees, especially Steiner, centered on the fact that they were females. It is one thing to call a woman "worthless," and another to call her a "worthless broad."

Furthermore, even if Trenkle used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby "cure" his conduct toward women. *Ellison* unequivocally directs us to consider what is offensive and hostile to a reasonable *woman*. *Ellison*, 924 F.2d at 878 ("conduct that many men consider unobjectionable may offend many women"). And finally, although words from a man to a man are differently received than words from a man to a woman, we do not rule out the possibility that *both* men and women working at Showboat have viable claims against Trenkle for sexual harassment.

The district court's misunderstanding is also revealed by its perception that Steiner's claim is somehow defeated by the fact that Trenkle referred to Asians as "UFO's—ugly fucking orientals." Order of Sept. 23, 1993, at 14. Again, such insulting language differs fundamentally different from terms like "jerk" or "asshole;" it is a race-based insult which, like Trenkle's gender-based comments, might well violate Title VII if made to an Asian employee. The fact that Trenkle may have uttered racially discriminatory slurs only suggests that he was just as insensitive in matters of race as in those of gender. It in no way excuses his conduct toward Steiner.[5]

■ There is no doubt that Steiner was sexually harassed. The only question is whether Showboat is relieved of liability for Trenkle's actions because it took sufficient disciplinary and remedial action in response to Steiner's complaints. *See Intlekofer v. Turnage*, 973 F.2d 773, 779–80 (9th Cir.1992); *Ellison*, 924 F.2d at 881–82. The evidence suggests that Showboat was consistently slow to react to Steiner's claims, and did not seriously investigate them or strongly reprimand Trenkle until after Steiner had filed her complaint with the NERC. Moreover, Showboat twice changed *Steiner's* shift to get her away from Trenkle, rather than changing his shift or work area within the casino or, indeed, firing him outright and early on. *See Intlekofer*, 973 F.2d at 780 n. 9 (a victim of sexual harassment should not have to work in a less desirable location as a result of the employer's remedial plan); *Ellison*, 924 F.2d at 882 (same). Although Showboat finally fired Trenkle, it was for his comments to a different woman, and it was done only after Steiner and the NERC had convinced Showboat that Trenkle's behavior could become a serious legal liability for the casino.

We reverse the district court's grant of summary judgment in Showboat's favor, and remand for further proceedings. Unless Steiner's evidence is cast into substantial doubt by Showboat's opposition, it would seem that on remand Steiner herself may be entitled to summary judgment on her claim of sexual harassment.

## II. *Retaliation*

■ Steiner also claims Showboat acted in violation of 42 U.S.C. § 2000e–3(a) (1982) by retaliating against her for complaining about Trenkle and for filing two complaints with the NERC. To make out a prima facie case she must establish that she acted to protect her Title VII rights, that an adverse employment action was thereafter taken against her, and that a causal link exists between these two events. *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The burden of production then shifts to Showboat to advance legitimate, non-retaliatory reasons for any adverse actions taken

---

5. We also reject Showboat's assertion that Steiner somehow "welcomed" Trenkle's harassment because she herself talked like a "drunken sailor," since there is no suggestion in the record that Trenkle's remarks were in fact welcomed.

We do not rule out, of course, the possibility that an employee who regularly subjects her co-workers to sexually abusive language effectively might invite them to respond in kind.

against Steiner; she has the ultimate burden of showing that Showboat's proffered reasons are pretextual. *Id.; Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 730–31 (9th Cir. 1986) (order and allocation of proof for retaliation claims follows familiar scheme announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Steiner alleges three acts of retaliation, none of which ultimately passes muster.

■ Steiner first points to her transfer to day shift from swing shift, as a result of her letter to management stating that Trenkle was still harassing her. While this action was an instance of insufficient *remediation, see Ellison,* 924 F.2d at 882, it was not retaliatory in nature.[6] The record shows clearly that Showboat was trying to avoid trouble between Steiner and Trenkle. Because Steiner has presented no evidence to rebut Showboat's evidence that the transfer was not retaliatory, Steiner's claim cannot survive summary judgment on this basis.

■ Steiner next claims that her three low marks on Showboat's employee evaluation were an act of retaliation by Showboat. The evaluations were the idea of Showboat's new management team, and had not previously been performed. Again, while Steiner has made out a prima facie case, she has presented no evidence at all to rebut Showboat's strong showing of a non-retaliatory reason. Steiner's low marks were based on Showboat's contention that she needed to learn to supervise games other than blackjack; Showboat had sent Steiner a letter to this effect earlier in the year. Letter from G.C. Taylor, Jr. to Barbara Steiner (July 17, 1989). Moreover, Showboat claims the evaluations were not going to be used to fire anybody, and there is no indication in the record that they were used as the basis for any adverse actions against Steiner. Finally, at least two male dealers received worse marks than Steiner.

Steiner also relies on the alleged episode in which her new supervisor, Dean Flurry, ridiculed her by making her supervise a game of roulette although he was fully aware she could not competently do so. She alleges no plausible, concrete connection between this incident and her complaints about Trenkle. Flurry was the supervisor who gave her low marks because she didn't know how to supervise roulette; this incident, if true, is more likely to have been his way of driving home her need to hone her job skills than an act of retaliation by *Showboat* against her for her complaints about Trenkle.[7]

Steiner has failed to present triable issues of fact sufficient to support her retaliation claim. We therefore affirm the district court's grant of summary judgment in Showboat's favor on the retaliation claim.

### III. *Constructive Discharge*

■ To survive Showboat's motion for summary judgment on this claim, Steiner must show that there are triable issues of fact as to whether "a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions." *Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir. 1989); *Jordan,* 847 F.2d at 1377; *see generally* Note, "Constructive Discharge under Title VII and the ADEA," 53 *U.Chi.L.Rev.* 561 (1986).

Several facts militate against Steiner's claim. First, Trenkle was fired two and one-half months prior to her resignation. *Cf. Brady v. Elixir Industries,* 196 Cal.App.3d 1299, 242 Cal.Rptr. 324, 328 (Cal.App. 4 Dist. 1987) (in order to constitute constructive discharge, harassment must be intolerable "*at the time of the employee's resignation*") (emphasis added). Second, for several months prior to her resignation she had been restored at her request to her favored shift: the swing shift. Third, she has failed to establish any retaliatory conduct by Show-

---

6. We note in addition that the transfer is just barely—if at all—characterizable as "adverse" employment action: Steiner was not demoted, or put in a worse job, or given any additional responsibilities. In fact, at first she even claimed to enjoy the day shift.

7. Flurry, part of the new management team, had worked for Showboat a very short time when Trenkle was fired. There is thus little reason to suspect—and no evidence to show—that he had a connection to Trenkle which would lead him to retaliate against Steiner on Trenkle's behalf.

boat's management or employees. Taken together, these facts suggest that Steiner had effectively petitioned Showboat management and the NERC for relief from Trenkle's harassment, in the sense that his sexual harassment had been halted some time before she quit.

Steiner claims that the low marks on her employee evaluation, and the alleged roulette wheel incident with Flurry, indicate that Showboat was laying the groundwork for her termination, or was attempting to force her to quit. But Steiner has established neither that her evaluation was discriminatory or retaliatory, nor that it constitutes the kind of "intolerable" act that would force an employee to resign. *See Thomas*, 877 F.2d at 1434; *compare with Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir.1990) (constructive discharge occurred where unfounded negative evaluations led to denial of merit pay on two separate occasions, and where employee's attempts to challenge loss of pay were rebuffed). Indeed, the evaluation as a whole characterized her as an "acceptable" employee. Similarly, Steiner has not established an issue of fact as to whether Flurry's alleged actions were discriminatory or retaliatory in nature; at worst, they would constitute a harsh way of driving home his criticism of her job skills.

While we dismiss this claim, we do not mean to suggest that the fact Steiner quit her job may not weigh in to her proof (1) of damages for sexual harassment and (2) of the extent of her distress and other damages for the intentional infliction of emotional distress claim. Steiner began her career at Showboat as a promising employee, the Casino's first female floorperson; it ended, sadly, in defeat. Steiner's personal notes make it clear she was in considerable emotional turmoil at the time she resigned from her job with Showboat. Her treatment by Trenkle in all likelihood poisoned her relationship with Showboat management, and may have persuaded her that it was out to get her. The fact that she quit may be evidence of the emotional turmoil and instability caused by Trenkle's conduct.

## IV. *Intentional Infliction of Emotional Distress*

Steiner claims that Showboat is liable for Trenkle's intentional infliction of emotional distress upon her. To succeed on this claim, she must show that Trenkle engaged in "extreme and outrageous" conduct, intending to cause emotional distress or recklessly unaware of that possibility, and in fact caused severe or extreme emotional distress. *Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir.1992) (citing *Branda v. Sanford*, 97 Nev. 643, 637 P.2d 1223, 1227 (1981)); *Nelson v. Las Vegas*, 99 Nev. 548, 665 P.2d 1141, 1145 (1983); *see* Restatement of Torts (Second) § 46, at 73 (defendant's conduct must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community"). In addition, she must show that Showboat is liable for Trenkle's acts under the principles of respondeat superior. *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1375 (9th Cir.1990).

We have previously noted, in this context, that an employer owes his or her employees a greater degree of respect because of the employment relationship. *Dias*, 919 F.2d at 1374 (discussing Oregon law); Restatement (Second) § 46, comment (e). Moreover, while simple insults do not constitute intentional infliction of emotional distress, insults which include sexual or racial harassment may rise to that level. *Dias*, 919 F.2d at 1375; *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216, 217 (1970). Finally, where there is *public* humiliation it is much more likely that the tort action will lie. *Sanchez–Corea v. Bank of America*, 38 Cal.3d 892, 215 Cal.Rptr. 679, 691, 701 P.2d 826, 838 (1985).

In *Dias*, we upheld a jury verdict awarding a female plaintiff $625,000 for defendant Sky Chef's intentional infliction of emotional distress. Defendant's manager, who was plaintiff's supervisor, had engaged in a course of sexual harassment of plaintiff and other female employees; when she complained, he sabotaged her work and ultimately had her fired. 919 F.2d at 1373. In light of these precedents, we are unprepared to hold as a matter of law that public humiliation of an employee by her employer, accomplished

through rude, crude sexually explicit remarks and actions, cannot constitute intentional infliction of emotional distress. In fact it appears that only the degree of distress is at issue.[8] Since Steiner has raised triable issues of fact as to each of the aggravating factors discussed above, we hold that the district court erred in granting Showboat's motion for summary judgment.

AFFIRMED, in part, REVERSED, in part, and REMANDED.

---

8. Here, unlike in the Title VII context, the victim's actual, psychological harm is an essential element of the claim.